THE STATE, JOHN MORELAND ET AL., PROSECUTORS, v. THE CITY OF PASSAIC AND JOHN JELLEME.

Submitted December 5, 1898—Decided February 27, 1899.

1. Under a municipal advertisement for public work the specifications referred to contained a clause under which bidders were required to furnish a detailed specification of the manner in which they proposed to do part of the work, which part, however, was specified by the city with sufficient definiteness for a contract. The successful bidders omitted to do this, but a contract was, nevertheless, made with them on the basis of the city's plans and specifications. This contract being abandoned while the work was in progress, but before the part mentioned was begun, the city advertised for proposals to complete the work according to its plans and specifications and to do certain extra work, the bids to be separate for the completion and the extra work. *Held*—

   1. That the last advertisement contemplated but one proposal and contract for the whole work, though bids for the two classes were to be separate.

   2. That the detailed specification originally required of bidders was not required on the new competition. Bidders then were to be governed by the plans and specifications that entered into the first contract.

   3. That a material conflict, to the disadvantage of the city, between a detailed specification furnished with a proposal and the plans and specifications on which proposals were invited, rendered the proposal invalid.

2. A contractor is not precluded from taking public work on his individual account because his general business partner is a member of the municipal board that awards the contract.

---

On *certiorari.*

Before Justices LUDLOW and COLLINS.

For the prosecutor, *George P. Rust.*

For the defendants, *Walter Kip* and *William W. Watson.*

The opinion of the court was delivered by

COLLINS, J. In March, 1897, the city council of Passaic invited proposals for the erection of a fire engine-house and a police station in that city, under plans and specifications, to which bidders were referred. The following provisions of the specifications are pertinent in this case:

### "GENERAL CONDITIONS.

"The labor-and materials to be furnished are to be of standard quality of the best of their several kinds mentioned, and be acceptable in every respect to the committee and the architect, either of whom shall have the power and authority to reject any workmanship or materials which in their opinion does not conform with the strict intent and meaning of these specifications and the drawings. * * *

"The several contractors and mechanics are to work in harmony one with another, so as to best facilitate the progress of the work, and such cutting and fitting as is required and as is the usual custom is to be done when required.

"All materials and finished and unfinished work are to be properly and carefully cared for and protected from the weather or other damage at all times. * * *

"Such detail drawings as may be needed to fully explain any special portion of the work will be furnished as required by the architects, and are to be carefully and accurately followed.

"The architects are to be sole judges of the intent and meaning of these specifications and the drawings, and their decision on any matter relative thereto is to be final and decisive. * * *

## " STEAM-HEATING.

" The steam-heating is to be a thoroughly first-class, complete job in each and every particular, and is to be guaranteed of a capacity to maintain a temperature of seventy (70) degrees Fahrenheit in zero weather.

" The boiler, pipes, valves, fittings, radiators, connections, &c., are to be of the very best manufacture of standard make, and to be run, hung, secured and fitted in the strongest and most workmanlike manner.

"A connection is to be run from the boiler to supply the fire engine in the engine-room, and is to have an automatic cut-off.

" The system to be direct radiation, with double supply and return drip pipes.    Bundy radiators, Jenkins Brothers' valves and boiler of a thoroughly known reliable make, and be of a style and manufacture approved by the architects.

" The contractors for the steam-heating will furnish a full and detailed specification of the manner in which they propose to do their work, and the quality and name of the manufacturers of the materials they propose to use, which specification will form a portion of this specification and the contract."

The contract was awarded to a firm of contractors who gave sureties for its performance.    No detailed specification accompanied their proposal.    The contract, executed, provided for the erection of the building agreeably to drawings and specifications thereto annexed, being the same on which proposals were invited, and was otherwise silent as to steam-heating. It further provided that if the contractors should abandon the work, the city might complete the same by contract or otherwise at the contractors' expense and hold the contractors and their sureties liable for any excess of cost.    In May, 1898, the buildings being far from completion, the contractors, in writing, abandoned their contract and authorized the city council to proceed in such manner as they might desire to complete

the building. Up to that time nothing had been done on the steam-heating; but the contractors had received from a firm of sub-contractors a proposal for that part of the work, containing a detailed specification of what the sub-contractors proposed to do and had submitted such specification to the city's architects, who had disapproved it. The city council, by resolution approved by the mayor, authorized a committee to advertise for proposals for the completion of the building and for the doing of such extra work as might be necessary. The committee invited such proposals by the following advertisement:

## "BIDS FOR FIRE DEPARTMENT AND POLICE BUILDING PROPOSALS.

"By direction of the city council of the city of Passaic, bids are hereby invited for the completion, in accordance with plans and specifications, of the new fire department and police building, and for the remedy of any defects, due to failure to follow the said plans and specifications, or by poor workmanship or negligence.

"Also bids for the extra work in accordance with the additional specifications on file in the office of the city clerk.

"These bids to be distinct and separate.

"Plans and specifications may be seen at the office of the city clerk, and all further particulars obtained there.

"Bidders will be required to deposit with their bid a certified check for three hundred dollars, said check to be returned to unsuccessful bidders as soon as the contract is awarded.

"The successful bidder will be required to give bonds to the full amount of his or their bid, and upon the execution of the contract and acceptance of the bond the certified check will be returned to said contractor.

"The building to be completed by September 15th, 1898.

"Proposals must be sealed and addressed to the 'Committee on Municipal Buildings,' in care of the city clerk.

" The committee reserves the right to reject any or all bids, and all bids must be submitted on the third day of June at 8 o'clock P. M.

" John A. Parker,

" John J. Welsh,

" Hamilton K. Beatty,

" Committee on Municipal Building.

"Dated at Passaic, N. J., May 25th, 1898."

In response to this invitation two proposals were received, one from John Jelleme, for the completion of the original contract, $16,337, and for the extra work, $2,000—in all, $18,437; and one from Moreland Brothers, for completion of the original contract, $16,335, and for the extra work, $1,776.50—in all, $18,111.50. Jelleme furnished no detailed specification of steam-heating, but Moreland Brothers had procured from the manufacturers the same proposal that had been made to the original contractors, and submitted that as the detailed specification that they assumed was called for by the advertisement. This proposal conflicted with the city's specifications in several important respects. It guaranteed a temperature of seventy degrees in only the court-room, offices and living-rooms, while for the sleeping-apartments, assembly hall and stables there was guaranteed only sixty-five degrees. It required the foundation for the boiler, flue for smoke and draught, and trenches and covers, if needed, to be provided by the owner, and all cutting and repairing of floors, walls and ceilings and enclosure and covering of flues and pipes to be done by the owner, and it provided that if the apparatus was used for the benefit of mechanics or owner it must be at owner's responsibility, and that when completed it should be considered as left in charge of the owner and the contractors no longer responsible for it. Other supposed variations, such as not specifying that the radiators should be Bundy's and the valves Jenkins', are probably only incomplete statements to be supplemented by the city's specifications; but in the respects above indicated the differences seem important and to the city's

disadvantage. The committee reported that the heating specification submitted by Moreland Brothers was not in accordance with the plans and specifications of the city; recommended that the contract for completion of the original contract be awarded to John Jelleme for $16,335; and (as they recited), taking into consideration the delays, &c., that might follow in having two contractors on the work, and believing it to be for the best interests of the city, recommended that the contract for the extra work be awarded to John Jelleme for $2,100. At a regular meeting of the council held on June 6th, 1898, this report was received and on motion the recommendation of the committee was adopted and the contract awarded to John Jelleme. This action is the subject of the present *certiorari.* The prosecutors complain both as bidders and as taxpayers.

It is first objected that Jelleme's bid was not valid because not accompanied by a detailed specification of the steam-heating proposed. Much testimony of experts has been taken with the idea of construing the clause on that subject in the city's original specifications, but it seems plain enough. It did contemplate that such a specification should accompany the proposal, but it does not follow, even if the clause was applicable to the new advertisement, that the omission of the detailed specification would invalidate the proposal. Enough is stated in the city's specifications, aided by the plans, to form the basis of a definite contract, and the omission of the details called for might be waived by the city, as it was in the original contract. Unless unsuccessful bidders have themselves been strictly regular, they have, as such, no standing to attack an award. The prosecutors did indeed furnish a detailed specification of steam-heating, but, unfortunately for them, it materially differed from the requirements of the city's specifications, upon which their proposal had to rest, and had already been disapproved by the city's representatives. An attempt is made to prove an offer to the chairman of the committee to remove objectionable features, but that official very properly said that the offer came too late.

One of the prosecutors thinks that he told the committee that he would withdraw the specification altogether, but nothing formal was done in that direction, and I doubt the propriety of permitting it. I think that no specification of heating was needed, for all bidders were bound to know that the original contractors had furnished none, but had made a contract based only on the city's plans and specifications. It was *that* contract that was advertised for completion. The condition of the original bidding was no part of the city's *specifications*, and had no proper place in the new competition. Indeed, the original contractors could properly have objected to any such restriction on bidders, and the city had no right to require it. It might have been proper for the city, with the architects' aid, to have given further details, taking the risk of their being held, in any future litigation with those contractors or their sureties, to have been within the architects' province under the contract, but the course taken was the safer one. I think that Jelleme properly understood the advertisement when he refrained from submitting any specification for steam-heating, and was entitled to protection against his competitors' changing their bid, even if they misunderstood the advertisement. But the specification the prosecutors submitted did, of course, limit their proposal, and they must stand or fall by it. They urge that, at least as to the extra work, they should have had a contract. I do not think so. There was but one contract contemplated for the whole work, and the advertisement is so framed. The bids on the two branches were properly kept separate, to avoid complications with the original contractors and their sureties. The original contract provided for extra work, but only as agreed on, and to blend all in one bid might have been embarrassing. I do not say that separate contracts might not have been awarded. The committee, judging by their report, seem to have thought so, but the bidding was not on that basis, and it would have been absurd to have had work so intimately connected done by different contractors.

As I read the advertisement, bidders were to separate their

bids, but they were to bid on the whole work. A proposal to do the extra work only, or *vice versa,* would not have been within the call of the advertisement or the council's authority therefor.

As bidders the prosecutors have no standing, nor as taxpayers have they made out a case against the award of the contract. They argue that the original contractors and their sureties may resist settlement on the basis of the Jelleme contract. As to all but the extra work those persons can have no possible ground of complaint, and as to that are not interested unless it had been agreed on, which the case does not show. As to them the council need not have advertised at all, and a contract after advertising for bids is at best only *prima facie* evidence of the fair cost of completion. As to the prosecutors' interest as taxpayers to have the extra work go to the lowest bidder, it is sufficient to say that such work was a mere adjunct to the principal object contemplated, viz., the completion of the buildings. It was good judgment on the part of the municipal authorities to include all in one contract and, so considered, the award was properly made. Considered even as a separate matter, it would seem to be within the discretion of the council to award the extra work to the successful bidder for the completion of the original contract. The statute to which we are referred by the prosecutors as the sole authority for the work (*Gen. Stat.,* p. 1540, *pl.* 363) provides that every contract shall be awarded "to that responsible bidder who offers terms most advantageous to the city." There certainly is room to argue that it would be more advantageous for the city to pay the contractor for the buildings $2,100 for the extra work rather than to have that work done for $1,776.50 by a stranger. There would be risk of a lack of co-operation between the two contractors and consequent delay, to say nothing of the impracticability of doing the work in that manner. This court will not review the determination of a municipal board where there exists a rational basis to support it. *McGovern* v. *Board of Public Works,* 28 *Vroom* 580. In the absence of fraud or palpable

abuse of discretion the only question for judicial cognizance is whether there has been any violation of legal principles or neglect of prescribed formalities in entering into the engagement which is the subject of the controversy. *Van Reipen* v. *Jersey City*, 29 *Id.* 262, 268.

Lastly, it is urged that a contract with Jelleme is illegal because his business partner, O'Leary, is a member of the city council. No proof was offered that this was a partnership matter, and Jelleme testified that it was not. A contractor is not precluded from taking city work on his own account because a partner in his general business is a member of the municipal board that awards the contract. In this case O'Leary was excused from voting on the award of the contract; nine members voted for it and only one against it, the other two members being absent. There seems no substance in this objection.

The resolution brought up for our review is therefore affirmed, with costs.