## ANDREWS v. CITY OF DETROIT.

1. MUNICIPAL CORPORATIONS—PUBLIC WORKS—COMPETITIVE BIDS.
   Where a city advertised for bids to furnish boilers, superheaters, and furnace water walls, according to specifications furnished, for a municipal lighting and power plant, reserving the right to reject any or all proposals, in whole or in part, and requiring the bidder to state the amount to be deducted if the furnace water walls were omitted, and it appeared that there was a difference of $44,800 in the amount the two bidders offered to deduct if furnace water walls were not included, the action of the city in awarding the contract for boilers and superheaters to the lowest bidder, and asking separate bids for the furnace water walls was in no way violative of the charter provision relating to competitive bidding.[1]

2. SAME—BIDS MUST CONFORM TO SPECIFICATIONS.
   A bid to furnish boilers, superheaters, and furnace water walls must conform to the specifications in order to be considered.[2]

[1]Municipal Corporations, 28 Cyc. p. 1025; [2]Id., 28 Cyc. p. 1029.

**3.** SAME—FAILURE TO CONFORM TO SPECIFICATIONS IN UNIMPORTANT PARTICULAR.

    Objection that the bid accepted to furnish boilers and superheaters did not conform to the specifications in that it failed to state the temperature of the flue gas, as required, is without merit, in view of the fact that said question became unimportant when the city decided to contract for the boilers and superheaters without the water walls.[3]

**4.** SAME—AWARDING SEPARATE CONTRACTS—"ADEQUATE SECURITY" TO CITY.

    Objection that the city will not be given "adequate security" if the furnace water walls are eliminated from the contract, because there is no practical method of testing them separately from the boilers, is answered by No. 25 of the general conditions of the specifications, which requires a contractor to inspect and see that the work of any other contractor is fit and proper for the reception of his work if it is dependent thereon for proper execution or results.[4]

Appeal from Wayne; Jayne (Ira W.), J. Submitted October 6, 1925. (Docket No. 4.) Decided December 22, 1925.

Bill by Harry E. Andrews against the city of Detroit, the W. E. Wood Company, and others to enjoin the performance of a contract for the construction of a municipal lighting and power plant. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Warren, Cady, Hill & Hamblen* (*John G. White,* of counsel), for plaintiff.

*Charles P. O'Neill,* Corporation Counsel, and *Clarence E. Page,* Assistant Corporation Counsel, for defendant city *et al.*

*Monaghan, Crowley, Reilley & Kellogg,* for defendant W. E. Wood Company.

[3]Municipal Corporations, 28 Cyc. p. 1029; [4]Id., 28 Cyc. p. 1030.

SHARPE, J.    On April 2, 1923, the voters of Detroit authorized the issue of $12,000,000 in public utility bonds for the construction and equipment of a new municipal lighting and power plant.    The public lighting commission employed a firm of engineers to prepare plans and specifications for the various units of the system, and to superintend the construction thereof.    The action of the commission and the common council in awarding a contract for boilers, pursuant to bids received, was vetoed by the mayor, and new bids asked for.    Several were submitted.    That of the defendant W. E. Wood Company, for boilers and superheaters, was accepted and a contract for its performance entered into on September 2d, and confirmed by the common council on September 10, 1924.

On September 22, 1924, the plaintiff, a taxpayer and resident of the city, filed the bill of complaint herein, praying that the defendants be enjoined from proceeding with the performance of the contract for the several reasons hereinafter referred to.    He here appeals from a decree dismissing his bill.

1. Competitive Bidding.    The "Notice to Bidders" required proposals to be made on a form attached thereto, "to be copied by the bidder," and stated that the commission reserved "the right to reject any or all proposals, in whole or in part."    The specifications described the entire plant, consisting of "two steam generating units, an electrical generating unit, auxiliaries, piping system, and electrical connections and apparatus."    The "Specifications for Boilers" included "superheaters and furnace water walls."    In the proposal the bidder was required to state "Amount to be deducted from contract price for omitting furnace water walls."    While several bids were received, but two were considered.    The others apparently did

233—Mich.—6.

not comply with the specifications.    The W. E. Wood Company bid for boilers, superheaters and water walls was $545,991, and that of the D. Connelly Boiler Company was $590,000.    The Wood company offered to deduct $244,800 if the water walls were omitted, and the Connelly company $200,000.    The Wood company bid was therefore the lowest.    It will be noticed that there was a difference of $44,800 in the amount these two bidders offered to deduct if not required to furnish the water walls.    Each of them proposed to furnish water walls manufactured by the same firm, and of similar type and construction.    In view of this fact, it is not surprising that the engineers stated their belief that the water walls could be purchased more advantageously independent of the boilers, and recommended that separate bids be asked for them. The commission so concluded, and, after ascertaining from the bids submitted that the Wood company was the lowest bidder for the boilers and superheaters, entered into the contract in question with that company.

The statement in the proposal that a certain amount would be deducted if the water walls were omitted was no different, in effect, from an offer to furnish the boilers and superheaters for a specified sum.    The determination as to the lowest bidder was "a mere matter of inspection and calculation, in respect to which there can be no room for dispute."    *Detroit Free Press Co.* v. *State Auditors*, 47 Mich. 135, 143. The acceptance of the Wood company bid in no way violated the provision of the charter relating to competitive bidding.

2. Temperature of Flue Gas.    In the proposal submitted, the bidder was required to state the sum for which it would furnish and install the machinery and equipment in conformity with the specifications.    It also guaranteed that the deviation from the character

and performance of the completed work would conform to a table showing "the expected performance of a steam generating unit," and not exceed the tolerances therein stated.    The blanks in this table required a statement of the time within which the contract would be completed, the weight of the boilers, their heating surface per boiler square foot, and other particulars.    Among them was:

"Per Cent.
Tolerance

Outlet temperature of flue gases in degrees F. when the approximate furnace temperature is 2,500 deg. F. and the superheat, evaporation and weight of flue gas is:

| Evaporation | Superheat | Flue Gas | |
|---|---|---|---|
| 50,000 lbs./hr. | 255 Deg. F. | 62,000 lbs./hr..... | .... |
| 100,000 lbs./hr. | 265 Deg. F. | 116,000 lbs./hr..... | .... |
| 150,000 lbs./hr. | 255 Deg. F. | 173,000 lbs./hr..... | .... |

(Submit curve.)"

In the Wood company bid No. 11 appeared as follows:

"Per Cent.
Tolerance

Temperature in degrees F. of flue gas at outlet of boiler, with furnace gas entering boiler at 2,500 deg. F., without allowance for the superheaters or furnace water wall surface, but assuming the superheat stated in the engineers' statement of expected performance in figuring the rating, when the boiler is clean externally and internally and the evaporation, boiler feed temperature, superheat and weight of flue gas are:

| Evaporation Lbs./hr. | Feed Temp. Degs. F. | Superheat Degs. F. | Flue Gas Lbs./hr. | | | |
|---|---|---|---|---|---|---|
| 50,000 | 290 | 255 | 62,000 | 610 deg. F. | Plus | 10 degs. |
| 100,000 | 343 | 265 | 116,000 | 765 deg. F. | Plus | 15 degs. |
| 150,000 | 380 | 255 | 173,000 | 935 deg. F. | Plus | 20 degs." |

In the D. Connelly Boiler Company bid the blanks after "Evaporation," etc., were filled in as follows: In the first line, "500 Deg. 5%;" in the second, "590 Deg. 5%;" and in the third, "680 Deg. 5%." The "5%" is under the heading "Per Cent. Tolerance."

Counsel for plaintiff insist that the bid of the Wood company did not comply with the specifications in its answers to No. 11, and should not have been considered in awarding the contract. There can be no question that the bid must conform to the specifications, and the contract to both. 2 Dillon on Municipal Corporations (5th Ed.), 1214.

It is apparent from the proofs that no guarantee was expected to be made, or could be made, of the outlet temperature of the flue gases. Mr. Walton, the engineer who prepared the specifications, testified that they did not look on the answers as "a prescribed performance." He further testified:

"Q. But you did make a requirement in your specifications for the efficiency of the boiler unit as we have talked of it here, that is the several integral parts, water walls, boiler tubes, superheater, and so forth?

"A. No. The specifications themselves do not require the contractor to meet any certain efficiency in that.

"Q. Well, you did require the contractor to meet a certain minimum of flue gas temperature, did you not?

"A. No; that was not a requirement."

The question (11) as asked applied to the entire "steam generating unit," consisting, as stated in the specifications, of a "boiler, furnace or stoker, superheater and economizer." The water walls were also included. The primary purpose of their installation is to protect the brick work lining of the furnace, which softens under high temperature. They permit a hotter fire to be maintained in the fire box and a greater evaporation of water in the boiler. The

engineers, however, seem agreed that they have no exact knowledge of how much heat will be absorbed by them. They seem to be agreed that their use will affect the temperature of the flue gases, but, as stated by Mr. Crane, one of the engineers called by plaintiff, "it has not yet been definitely determined just what can be expected of water walls." He further testified:

"I know of no method by which we can determine the amount of work done by the water wall as distinguished from the boiler. * * * There is a basis for determining precisely what amount of temperature will be reduced by a superheater but not by a water wall."

He further testified:

"I have looked at the drawings of the boilers proposed by the Connelly company and the Wood company. They are almost identical as far as I can see from the drawings. I know of no reason why they should not have the same efficiency and capacity."

These bidders proposed to furnish similar superheaters and water walls. As before stated, the commission had the right to contract for the boilers and superheaters without the water walls. When they concluded to do so, no importance attached to the answer relative to the temperature of the flue gas. The contract, performance of which is sought to be enjoined, conformed in all respects to specifications and the bids received thereunder for furnishing boilers and superheaters. By its acceptance, the commission has saved the city a considerable sum of money, and its performance should not be enjoined.

3. *Adequate Security.* Title 6, chapter 7, section 3, of the city charter, requires all such contracts to be entered into "with the lowest responsible bidder, with adequate security."

It is urged that as the water walls—

"form an integral and inseparable part of the boilers in operation and that as there is no practical method of testing the performance of the water walls separately from the boilers under actual operating conditions,"

the city will not be given "adequate security," as required by the charter provision, if the water walls be eliminated from the contract.

The wisdom of the commission in reserving the right to contract for the boilers and superheaters independent of the water walls has been pointed out. Its engineers recommended such action. The contract in question received the approval of the common council of the city, after several public hearings, at which it will be assumed the claims of the other bidders were presented. No. 25 of the "General Conditions," which formed a part of the specifications, reads as follows:

"The commission reserves the right to let other contracts in connection with this work. The contractor shall afford other contractors reasonable opportunity for the delivery and storage of their materials and the execution of their work and shall properly connect and co-ordinate his work with theirs.

"If any part of the contractor's work depends for proper execution or results upon the work of any other contractor, the contractor shall inspect and promptly report to the engineer any defects in such work that render it unsuitable for such proper execution and results. His failure so to inspect and report shall constitute an acceptance of the other contractor's work as fit and proper for the reception of his work."

Under this provision, the duty is imposed on the Wood company to inspect the work done under the contract for the installation of the water walls, if one be entered into, to the end that, when the entire work is finished, the boilers, superheaters and water walls will properly work together and form a completed unit. The bond for performance is not before

us.    We can but assume that the interests of the city are fully protected by it.

The decree dismissing plaintiff's bill will be affirmed, with costs to appellees.

MCDONALD, C. J., and CLARK, BIRD, MOORE, STEERE, FELLOWS, and WIEST, JJ., concurred.