GEORGE A. FULLER COMPANY *v.* CLARENCE E. ELDERKIN ET AL.

WILLIAM F. BROENING ET AL. *v.* CLARENCE E. ELDERKIN ET AL.

[Nos. 18, 19, April Term, 1931.]

*Decided April 30th, 1931.*

The causes were argued before BOND, C. J., PATTISON,. URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*Edward E. Hargest, Jr.,* with whom were *O. Bowie Duckett, Jr., and John Philip Hill,* on the brief, for the George A. Fuller Company, appellant.

*Allen A. Davis, Assistant City Solicitor,* with whom was *A. Walter Kraus, City Solicitor,* on the brief, for William F. Broening and others, appellants in No. 19.

*Philip B. Perlman,* with whom were *Mullikin, Stockbridge & Waters,* on the brief, for the appellees.

ADKINS, J., delivered the opinion of the Court.

These appeals grew out of a contract awarded to the appellant George A. Fuller Company, by the Board of Awards of Baltimore City, to erect a building for the Enoch Pratt Free Library. The appeal in No. 18 was by the said company, and in No. 19 by the mayor and others, comprising the board of awards, the Mayor and City Council of Baltimore, and several heads of city departments. The appeals are from a decree of the Circuit Court No. 2 of Baltimore City: (1) making perpetual the injunction theretofore granted restraining the defendants in No. 18 from executing a contract with the George A. Fuller Company for the construction of the Enoch Pratt Free Library Building, and from performing any duties in connection with said contract, and from paying out any moneys of the taxpayers of the City of Baltimore in connection therewith; (2) declaring the action of the board of awards in attempting to award said contract to said company null and void, "for the reason that the bid of the George A. Fuller Company was not in compliance with the proposal and specifications" for the construction of said building: (3) restraining said company from taking any action in furtherance of said award; (4) requiring the individuals constituting the board of awards "to give further consideration to the bids received on December 17th, 1930, for the construction of the Enoch Pratt Free Library Building, and to award the contract for the construction of said building to the lowest responsible bidder who complied with the proposal and specifications."

The bill of complaint was filed by Clarence E. Elderkin, as a taxpayer, and Consolidated Engineering Company, as a taxpayer and as one of the bidders. In the bill it was alleged that in the specifications it was specifically provided that bids should be submitted on the entire contract, and that, under the caption "Instruction to Bidders," it was provided that all information called for by the proposal form must be given and all spaces filled in and all alternates and unit prices bid upon; that in the proposal form furnished all prospective bidders "bids or proposals were required to be made on seven different sets of alternates, so that the board of awards, in exercising the discretion vested in it by section 15 of the Baltimore City Charter, could modify or change the original or base specifications by adding thereto alternates, described as such in the specifications and in the proposal form"; that there were twelve bidders, including the plaintiff and defendant companies; that the building engineer of Baltimore City, with the approval of the chief engineer, recommended that the contract be awarded to the George A. Fuller Company on its base bid of $2,044,000, together with certain alternates, which reduced its net bid to $2,003,000; that the Consolidated Engineering Company's base bid was $2,046,000 or $2,000 more than the base bid of the Fuller Company; that on the selected alternates the engineering company's bid was reduced to $2,017,000; that all the other bids were greater in amount; that the plaintiffs protested against the award to the defendant company because an examination of its bid showed that it was defective for the following reasons: (1) In alternate No. 4 requiring bids on two heating control systems designated as (a) and (b), being respectively the Webster master control and orifice system, and Dunham differential system, it named additional sums of $3,500 and $6,000 respectively to be added to the base bid, but failed to give as to each the saving in steam consumption in per cent. as required; (2) in alternate No. 5, relating to the air-cooling system, it failed to bid on two of five different alternates, viz. (a) and (c); that among the alternates included in the recommended award were 4 (a) and 5 (b), but at a subse-

quent meeting of the board of awards the building engineer, with the approval of the chief engineer, made a new recommendation, viz:. that alternate No. 5 (e) be accepted in lieu of alternate No. 5 (b), which further reduced the amount of the net bid of the Fuller Company by the sum of $5,000; that, after reading and considering the opinion of the city solicitor as to the effect of the omissions in the bid of the Fuller Company, the board of awards accepted the recommendation of the building engineer, and attempted to award the contract to the Fuller Company, the plaintiffs again protesting; that the action of the board of awards deprives the taxpayers of Baltimore of the benefit of the guaranties specifically required by the specifications and proposals as to alternate No. 4 (a); that, in the absence in the bid of the Fuller Company of any guaranty in saving of steam consumption, it was impossible for the board of awards to decide that the Fuller Company was the low bidder on the contract for which bids had been asked; that the failure of the Fuller Company to bid on alternates 5 (a) and 5 (c) constituted a serious and material departure from the requirements of the specifications and proposal forms, and deprived the City of Baltimore of competition on these two alternates; that, because of its failure to guarantee any saving in steam consumption, the Fuller Company was not the lowest bidder on the contract, but that the lowest bidder was the Consolidated Engineering Company; that, in any event, the bid of the Fuller Company did not meet the requirements of the specifications, and that the defects in its bid are material and substantial, and of such character as are beyond the power of the board of awards to ignore, disregard or waive; that the plaintiff company complied fully and completely with all of the requirements of law, the advertisements and notices, the specifications and proposals, and is entitled to the award of the contract. Answers were duly filed and testimony taken, whereupon the above-mentioned decree was passed. There are three questions raised by these appeals:

(1) Were there such defects in the bid of the Fuller Company, as to put it beyond the power of the board of

awards to award it the contract, if in the exercise of a reasonable discretion the board determined that the Fuller Company was the lowest bidder?

(2) Did the failure of the Fuller Company to guarantee a saving of steam in its bid on alternate 4 (a) make it impossible for the board, in the exercise of a reasonable discretion, to find that said company was the lowest bidder?

(3) Did the chancellor have authority by mandatory injunction to require the board of awards to further consider the bids received by it and award the contract to the lowest responsible bidder which complied with the proposals and specifications?

1. It is not every failure in bidding to comply with specifications that will make an award illegal. "Variations from specifications must be substantial so as to give the bidder special advantage, to invalidate the contract." *McQuillan on Municipal Corporations* (2nd Ed.), vol. III, sec. 1321. See also, 44 *C. J.*, p. 11; *Abbott on Municipal Corporations*, p. 263.

In *Maryland Pavement Co. v. Mahool*, 110 Md. 397, 407, 72 A. 833, 834, it was said: "Slight irregularities in a bid not affecting its substantial characteristics may be disregarded." In that case it was held that even such irregularities furnish ground for the rejection of a bid if the city elects to take advantage of them, but the clear inference is that they do not affect the legality and award. The statement that, "where reasonable requirements have been prescribed as to the manner of bidding, such requirements must be complied with, in order that a bid shall be entitled to consideration," clearly meant that compliance was necessary to enable the bidder to compel acceptance to his bid. The bidder there was the plaintiff in a mandamus proceeding, and the irregularity was in fact a material departure from the specifications, and the city elected to disregard his bid. It was not a case where the city's power to award the contract, notwithstanding the irregularities, was challenged.

The test seems to be, Is the irregularity such as will operate to affect fair and competitive bidding? *Phifer v.*

*City of Bayonne,* 105 N. J. Law, 524, 146 A. 463; *Faist v. Mayor and City Council of Hoboken,* 72 N. J. Law, 361, 60 A. 1120; *McCord v. Lauterbach,* 91 App. Div. 315, 86 N. Y. S. 503.

Judged by this test, certainly the failure to bid on alternates 5 (a) and 5 (c) could not be regarded as material. These alternates were not included in the plan finally adopted. The failure of the Fuller Company to bid on them could have had no effect on other bidders. *Warnock & Zahrndt v. Wray,* 132 Misc. Rep. 882, 230 N. Y. S. 681, is directly in point. See also, *Pascoe v. Barlum,* 247 Mich. 343, 225 N. W. 506; *Andrews v. City of Detroit,* 233 Mich. 79, 206 N. W. 514; *Nathan v. O'Brien,* 117 App. Div. 664, 102 N. Y. S. 947.

By not bidding on these items, the company took the risk of being excluded, if either of these alternates should be adopted, or if the city should elect to disregard the company's bid because of its failure to comply with the city's request to bid on all items. · In this connection, it is to be observed that compliance with this instruction was not made a condition to the consideration of a bid, but the city merely "reserves the right to reject any bid or proposal not in compliance with the above." That negatives the idea that the city deprived itself of the power to waive an irregularity. It is apparent from the rulings of the chancellor on proffers of evidence, and his comments in making the rulings, that he regarded such deviations from the requirements of the specifications and instructions as fatal to the validity of the award. In this, in our opinion, he was in error. We find nothing either in the provision of the city charter or in the decisions of this court cited by appellees to support that view.

In *Konig v. Baltimore,* 126 Md. 606, 95 A. 478, much relied on by appellee, there was a material advantage given to one of the bidders in permitting qualifications of his bid.

There is no difference in principle in the matter of alternates between this case and that of *Baltimore v. Flack,* 104 Md. 130, 64 A. 702, where bids were asked on various paving materials, except that here bidders were requested to bid

on all items. As we have seen, the failure to observe this request left it optional with the city to consider or disregard the bid. What we have said in regard to alternates 5 (a) and 5 (c) applies to alternate 4 (b), which was not adopted.

In considering the matter of compliance with the terms of bidding, there is some difficulty in determining the effect of the failure of the company to fill in the blank form as to per cent. of saving of steam guaranteed in alternate 4 (a), which was adopted. There can be little question, however, that, if there had been written in the blank the smallest fraction of 1 per cent., or even "no saving guaranteed," that would have fulfilled the requirement. We have concluded that the failure to fill in this blank was equivalent to saying "no saving guaranteed," and therefore was a sufficient compliance.

2. It is argued by appellees that, by reason of the guaranty by the Consolidated Engineering Company of twenty-five per cent. of steam, it was the lowest bidder, and that argument is based on a capitalization of the estimated annual saving. A witness for plaintiffs estimated the cost of steam without the controlling device would be about $13,000 a year; twenty-five per cent. of which would be $3,250, which, capitalized at four per cent., would amount to about $80,000, whereas the Fuller Company's total bid was only $19,000 less than that of the engineering company. But that argument, while plausible, is not convincing, when it is recalled that the bid of the engineering company for installing the device was only $4,500. It requires some imagination to fancy a jury giving a verdict of $80,000 in a suit on the company's bond in such circumstances. As said in 19 *R. C. L.,* p. 1069, par. 356: "What the public desires is a well constructed work and a lawsuit against even a responsible defendant is a poor substitute." The chancellor evidently was not impressed with the estimate of the witness referred to, as he remarked that no one would bet on it. But, apart from this practical consideration, the proposed guaranty was not for any specified time, nor was there any evidence as to the length of life of the device. It could well be argued from the

statement in the specifications that "the installation shall be thoroughly tested by the contractor after completion to insure that the economies guaranteed are actually effected. Such tests shall be made to the approval of the building engineer until economy obtained to the full amount stated in bids," meant that the economy guaranteed was to be shown at the beginning, but not necessarily continued indefinitely; that the test was what the machine could do, not what it would do through a series of years. The value of the guaranty is too speculative to enable us to say that the board of awards was bound to capitalize the estimated savings in reaching a conclusion as to the lowest bidder. It was for the board to consider this guaranty and to weigh its value as a practical proposition, in comparison with other features of the competitive bids.

The total cost of installing the device by the bid of the Fuller Company is $3,500. The company being a reliable company, as could well be presumed from the character of work it had done, it was not unreasonable for the board to assume that its installation of the device by it would be satisfactory; or, in the event it should not come up to expectation, that the $19,000 difference between the bids of the two companies would more than pay for a new installation with a satisfactory guaranty, as the other bidder was willing to do it for $4,500.

It was said in *Maryland Pavement Co. v. Mahool, supra*: "The subject has been frequently considered by this court, and all the cases hold that, when the awarding of a contract like the one here in question (paving contract) has been committed to a board, in the absence of fraud or collusion, its decision is final and conclusive and cannot be controlled by the courts." "The authorities are uniform in holding that, in determining who is the lowest responsible bidder, the municipal authorities have a wide discretion, will not be controlled by the courts except for arbitrary exercise, collusion, or fraud." And in *Madison v. Harbor Board,* 76 Md. 395, 25 A. 337: "The better doctrine, however, as to all cases of this

nature, and one which has the support of an almost uniform current of authority, is that the duties of officers intrusted with the letting of contracts for works of public improvements to the lowest bidder are not duties of a strictly ministerial nature, but involve the exercise of such a degree of official discretion as to place them beyond the control of courts by mandamus"—citing *Devin v. Belt,* 70 Md. 354, 17 A. 375. (See also *Baltimore, C. & P. B. Ry. Co. v. Latrobe,* 81 Md. 246, 31 A. 788; *Henkel v. Millard,* 97 Md. 30, 54 A. 657; *City of Baltimore v. Flack,* 104 Md. 107, 64 A. 702; 28 *Cyc.* 663; 20 *Encyclopedia of Law,* 1169). And it was further said: "It is of much more importance that a public contract, like the one in question, should be promptly awarded, and speedily executed with due regard to economy, than that any particular bidder should get the contract (*Com. ex rel. Snyder v. Mitchell,* 82 Pa. 343); and therefore it has been held by the great weight of authority that the public work shall not be delayed by appeals to the courts of dissatisfied and disappointed bidders, but that the decision of public officers, like these commissioners, upon questions such as those here involved, shall not be reviewed by the courts unless it can be shown that such public officers have been guilty of fraud in the exercise of their discretion (*High, Extr. Rem.,* sec. 92, and authorities there cited)." See, also, *McQuillan on Municipal Corporations* (2nd Ed.), vol. 3, sec. 1340.

Further citation of authorities would be superfluous to support the proposition that, where a body such as the board of awards, clothed with discretionary powers, acts within the power conferred by law and without taint of fraudulent, collusive, or arbitrary conduct, its conclusions, even if mistaken, are not reviewable by the courts.

There is no question here of fraud or abuse of discretion. On the contrary, it was conceded that the members of the board "canvassed the situation and they came to a conclusion which, in their judgment, whether legal or illegal, was for the best interests of the city."

The view of the chancellor was that the board exceeded its powers, in which view we are unable to concur. In our opinion, it was error to disturb the finding of the board.

This conclusion makes it unnecessary to consider the third question mentioned above, or the rulings on evidence.

*Decree reversed, and bill dismissed, with costs to appellants.*