STATE EX REL. HELENA ALLIED PRINTING COUNCIL ET AL., RELATORS, *v.* MITCHELL, SECRETARY OF STATE, RESPONDENT.

(No. 7,727.)

(Submitted September 21, 1937. Decided November 1, 1937.)

[74 Pac. (2d) 417.]

*Mr. Lester H. Loble* and *Mr. Hugh R. Adair,* for Relators, submitted a brief; *Mr. Loble* argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, and *Mr. Mark H. Derr,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Derr* argued the cause orally.

*Mr. E. G. Toomey,* Amicus Curiae, submitted a brief, and argued the cause orally.

MR. JUSTICE MORRIS delivered the opinion of the court.

This is an original proceeding, praying for a writ of injunction to restrain the Secretary of State from purchasing 300 copies of each current report of the opinions of the supreme court for the publication of which a contract was entered into by the members of the court with Bancroft-Whitney Company, of San Francisco, on July 17, 1937.

Pursuant to the provisions of Chapter 44 (sections 378–384) and section 283.1 of the Revised Codes, the members of the court caused the state purchasing agent to publish an advertisement inviting bids for the publication of the supreme court reports for a period of six years. Such advertisements are generally designated as proposals, and will be so hereinafter re-

ferred to. The proposal that was published by the state purchasing agent was as follows:

"Notice Printing of Montana Reports.

"Sealed bids will be received by the State Purchasing Agent at his office in the Capitol, at Helena, Montana, on July 12, 1937, at 10 o'clock A. M., for a contract to publish the decisions of the Supreme Court for a term of six (6) years beginning July 1, 1937. These bids must be for entering into a contract in conformity with the provisions of sections 378 to 384, inclusive, and section 283.1 of the Revised Codes of 1935. Special attention is called to section 381, relating to the terms of the contract, and to section 383, which requires the publisher to whom the contract is awarded to give a bond as a guaranty for its fulfillment.

"In order that the volumes contemplated in the contract may be kept up to the present standard of the Montana Reports, it will be specified in the contract that the publisher shall verify all cases cited in the opinions to be published, as to the spelling of the names of cases and the volume and page of the reports in which they are published, and shall add cumulative references so as to show by volume and page where the cases are reported in the Reporter System, and in the Annotated Reports.

"Each bidder must endorse on the envelope containing his bid the words 'Bids for the Publication of Montana Reports.'

"A. W. ENGEL,
"State Purchasing Agent."

In response to such proposal two bids were received, one from Bancroft-Whitney Company, of San Francisco, and the other from the State Publishing Company, of Helena, Montana. The bid of Bancroft-Whitney Company offered to supply the volumes of the reports authorized to be contracted for by section 381, and to make and preserve the stereotyped matrices therein referred to, and in all particulars such bid was responsive to the proposal as published. The bid of the State Publishing Company was confined to an offer to furnish the 300 copies of each report published during the current six-year period referred to in section 381, but no offer was made in the bid to furnish copies of any of the old reports beginning with Volume No. 1 and in-

cluding all reports published prior to those the publication of which was provided for in the contract of July 17, 1937. The reason given by the State Publishing Company for not submitting a bid responsive to the proposal in all particulars was:

"We cannot comply with the provisions of section 381 to furnish in full sets or odd volumes from No. 1 to date, but we have been advised legally that this is unconstitutional in that the State is a party to perpetuating a monopoly.

"We can comply with all the other provisions of sections 378 to 384, inclusive, and have made arrangements with a Montana attorney with considerable experience to do the editorial work, etc., as called for in your published invitation for bids."

On July 17, 1937, four members of the court, Mr. Justice Stewart being absent, met to consider the bids submitted, and, after careful consideration thereof, the contract was awarded to Bancroft-Whitney Company and duly executed. It was the opinion of the members of the court when the bids were under consideration that but one bid was submitted which was responsive to the proposal as advertised.

On the 27th day of July, 1937, the complaint herein was filed with the clerk of this court. After describing the parties involved, and alleging the relation of each to the matters in controversy, the complaint refers to the Bancroft-Whitney Company bid, recites the bid of the State Publishing Company in full, mentions the award made to the Bancroft-Whitney Company, and then recites section 283.1, which section will hereafter be set out in full.

The complaint also recites, in substance, the provisions of sections 260 and 261, which provide for the union label of the branch of the International Typographical Union located in the city where such matter was printed, to appear upon the printed matter contracted for, and alleges that the contract of July 17th imposes no such requirements on Bancroft-Whitney Company, and that the contract for reports heretofore supplied by Bancroft-Whitney Company does not bear such label. It further alleges that section 381 by its provisions "creates a monopoly and is therefore unconstitutional, void and invalid," by reason

of its being in violation of section 20, Article XV, and section 26, Article V, of the Constitution of the State of Montana, in that "it grants special and exclusive privilege, immunity and franchise to Bancroft-Whitney Company," and "that by the terms of such section any other publisher desiring to bid in response to such notice would be required to furnish complete sets or odd volumes of the Montana Reports, and that it is impossible for any publisher, other than the Bancroft-Whitney Company, to comply with said notice for bids for the reason that Bancroft-Whitney Company alone has in its possession and under its control stereotyped matrices of each volume heretofore published, has copyrighted each volume so published, and that any other publisher who republished such volumes so copyrighted would do so in violation of the copyright laws of the United States."

It is then alleged that the contract of July 17th is void and unlawful for the reason that "bids were called pursuant to section 381, which section has been repealed by virtue of section 283.1." It is further alleged that the State Publishing Company bid should have been accepted by virtue of section 283.1, and that the contract awarded on July 17, 1937, is "wholly ineffectual" by reason of its not complying with section 283.1. It is then alleged that the Secretary of State has threatened to and will, unless restrained, make the purchase of 300 volumes from Bancroft-Whitney Company, as heretofore referred to, and that such volumes will be paid for out of funds derived from taxation, part of which relator Harry E. Silver contributed as a taxpayer.

The State Publishing Company, the unsuccessful bidder, is not a party to this proceeding and makes no complaint about the award made by the court, and would, according to a former decision of this court, have no standing in court, as an unsuccessful bidder, if it sought to be heard. (*State ex rel. Stuewe* v. *Hindson*, 44 Mont. 429, 120 Pac. 485.) Such being the rule, no one predicating his right to be heard in this proceeding on the ground of discrimination between bidders could show any greater right than such unsuccessful bidder.

Relators here, however, allege and contend they have a right to be heard by reason of being affiliates of the International Typographical Union, and the relator Silver further asserts the right to be heard on the ground of being a taxpayer. All grounds upon which relators allege any right to be·heard are contained in paragraphs I and II of the complaint. The Attorney General, appearing for the Secretary of State, challenges all allegations of fact set forth in the two paragraphs mentioned. The right of the relators to be heard is thus brought directly in issue; their capacity as relators is denied; no evidence was presented to sustain the allegations of facts so challenged, leaving this vital issue supported by nothing but the assertions of the pleader. We think that a taxpayer, able to show substantial injury, would have a right to be heard, but the answer denies that any taxpayer appears as a plaintiff (or relator).

It is the rule of this court that in special proceedings only questions of law will be considered, but on rare occasions and in the interest of justice this rule has not been enforced and will be waived in this instance.

For the reasons stated, there is serious doubt about the capacity of either relator to maintain this proceeding in face of denial of capacity by the Attorney General. But, by reason of numerous allegations in the complaint to the effect that the court has entered into a void and illegal contract, the question of the capacity of the alleged taxpaying relator will be waived for the purpose of this decision in order that we may consider and determine the legality of the contract. However, the waiving of any defect of parties is not to be taken as establishing a rule on that point.

While the statutes are silent on the matter, we think that, by virtue of the duties imposed by Chapter 44 (secs. 378–384) on the members of the court, the court is thereby constituted a board of award for the purpose described in the chapter, and they will be so regarded in this opinion. In other words, in considering and awarding the contract of July 17, and doing other things in relation thereto, the members of the court acted, not as a court, but as a board of awards, and in the capacity of

a board of awards are subject to all of the provisions of the statutes relating to public boards of like nature.

It is first contended that section 381 has been repealed by section 283.1. For convenient comparison the two sections are herein set out in full:

"381. The justices shall have no pecuniary interest in the volumes of reports. The reports must be published by contract to be entered into by the justices and with the publishing house that will agree to publish the new volumes of the Montana reports for a period of six years, and also to furnish complete sets or odd volumes of Montana reports from and including volume one to the last volume published, to the state and the people of the state at prices fixed in the contract. Such contract shall require the publisher to print each volume in accordance with the specifications set forth in the preceding section. It shall also require the publisher to issue each new volume within ninety days after the manuscript for the same is delivered by the justices to the said publisher. Such contract shall also require the publisher to make stereotype matrices of each volume so published by him, and to preserve these matrices in fire-proof vaults, to the end that the volumes will never become out of print. The publisher receiving the contract as herein provided shall, before commencing the publication of the volumes of such reports, advertise in two newspapers in Montana for ten days for proposals for such printing, stereotyping, and binding of such volumes, and such publisher shall, if the proposals for such work do not exceed by the sum of twenty per cent. the amount for the same can be done outside of the state, cause such printing, stereotyping, and binding to be done within the state of Montana."

"283.1. The state purchasing agent shall, as occasion may require, call for bids for the printing and/or the binding of all decisions of the supreme court of Montana, all session laws, resolutions and memorials, and all codes and statutes (revised or otherwise). All contracts for the printing and/or binding thereof shall be let to contractors, publishers, or printers actually doing business within the state of Montana, and all labor

on or connected with such printing and/or binding shall be performed within the state of Montana; and no such printing or binding shall be done or performed without the state of Montana, provided, however, that nothing herein contained shall prevent the receipt of bids from contractors, publishers or printers doing business outside of Montana, and in the event that the bids for such printing and/or binding from contractors, publishers or printers actually doing business within the state of Montana are in excess of ten (10) per centum of the bids received for such printing and/or binding from contractors, printers or publishers doing business outside the state of Montana, contracts on such bids may be let or awarded to contractors, publishers or printers outside the state of Montana, and the labor thereon performed outside of Montana."

Section 283.1 does not expressly repeal section 381, and, as relators contend that one repeals the other, if such contention be sound, it necessarily follows that it must be by implication. To make effective the contention of such repeal, a number of well-established rules must be reconciled with such contention:

(1) Repeal by implication is not favored. (*Box* v. *Duncan,* 98 Mont. 216, 38 Pac. (2d) 986, 987, and cases cited.) This rule is too well established to require further comment.

(2) To make tenable the claim that an earlier statute was repealed by a later one, the two must be plainly and irreconcilably repugnant to or in conflict with each other, "must relate to the same subject; and must have the same object in view." (*Box* v. *Duncan,* supra; *State ex rel. Esgar* v. *District Court,* 56 Mont. 464, 185 Pac. 157.)

The only apparent irreconcilable conflict between the two statutes is that section 381 provides a 20 per cent. margin in favor of Montana printers and binders, while section 283.1 provides 10 per cent. This difference in the two statutes gives rise to no issue here, for the reason that the rights of no Montana bidder are involved, a question that will later be adverted to, and the bidder to whom the contract was awarded complied with the provisions of both sections by advertising to have such work

as is required by both sections, done in Montana, and no bid was received by Bancroft-Whitney Company for the printing and binding in Montana.

Furthermore, section 283.1 requires bids to be called for for *printing* and *binding* the reports, nothing more; while section 381, in addition to printing and binding, provides that the reports must be published by contract, the contract to be entered into by the justices of the court; it must be for a period of six years, and provide for furnishing complete sets or odd volumes from the first to the last volume published; all reports must be printed in accordance with the specifications set forth in section 380; each volume must be issued within ninety days after the manuscript is delivered by the justices to the publisher; must require the publisher to prepare stereotype matrices of each volume and preserve the same in fire-proof vaults. If section 283.1 repeals section 381, none of the above enumerated provisions relative to the publication of the reports would be provided for, and the publisher would not be required to make and preserve the matrices mentioned.

Section 381 covers every detail relative to the publication of the reports; section 283.1 relates solely to the matter of giving preference to Montana labor in the printing and binding of such reports. The provision in section 381 requiring the "publisher receiving the contract" to advertise for bids for ten days in two Montana papers calling for bids for printing and binding the reports in Montana and requiring such work to be done in Montana, clearly gives Montana labor preference, under the conditions named in the statute, by reason of the preferential percentage in favor of such labor. In this connection we call attention to the fact that Reports Nos. 16 to 31, inclusive, published in the period from 1895 to 1905, were published under contract with Bancroft-Whitney Company, but the printing and binding were done by the Standard Publishing Company, of Anaconda, as subcontractors under Bancroft-Whitney Company, as provided by the old statute.

Had any Montana printing concern desired to bid for the printing and binding of the Montana Reports contracted for

336

under the contract of July 17, 1937, with Bancroft-Whitney Company, and if that bid had been within the preferential percentage that the statute requires be given to Montana printers, the Bancroft-Whitney Company would have had to let the contract to such Montana printer. That company advertised for bids for the printing and binding for the statutory time in the "Montana Record Herald" and the "Great Falls Tribune," but no Montana printer submitted any bid in response to such advertisement. We are informed that this practice of advertising to have the printing done in Montana has been followed by the Bancroft-Whitney Company each time the contract has been awarded to that concern. Clearly, Montana labor has not been discriminated against. In passing, we will say that we think it is not necessary to bind by statute any citizen of Montana to patronize Montana concerns in preference to out-of-state concerns. That would be the natural inclination of everyone if the thing desired can be obtained at home, assuming, of course, that the home product would be satisfactory in all particulars.

(3) Statutes in apparent conflict must be read together and harmonized, if possible. (*City of Butte* v. *Industrial Acc. Board,* 52 Mont. 75, 156 Pac. 130.) This is an old, established rule of statutory construction in this jurisdiction, and we know of no jurisdiction where the rule is found to the contrary, and for that reason we think numerous citations unnecessary.

(4) Both statutes mentioned were carried forward into the 1935 revision of the Codes, and, by the Act of the legislature, were placed upon the same basis and neither takes precedence over the other. Section 1 of Chapter 1 of the 1937 Session Laws provides: "That the Revised Codes of Montana of 1935, in five volumes as compiled, numbered and arranged by the code commissioner appointed by authority of Chapter 89 of the Laws of the Twenty-third Legislative Assembly of Montana of 1933, and as certified to by said code commissioner are hereby, as to both form and substance, approved, legalized and adopted as the laws of Montana now in force and effect and the same are hereby declared to constitute the laws of Montana now in force

and effect except such laws as may be adopted by the Twenty-fifth Session of said Legislative Assembly."

The legislative assembly passed no bill that in anywise affected either section 381 or section 283.1, after the adoption of the section just quoted. Consequently, both sections are on a parity and must be construed, if possible, so that both may stand. We might say further that, if relators' contentions were upheld, all of the essential details governing the publication of the Montana Reports enumerated in section 381 would be wiped out, and the work of printing and binding only would find authority in the statutes. Section 283.1 merely relates to the mechanical work that may be said to come under the general head of printing, and does not assume to provide for the many things enumerated in the older section which, in substance, has been in full force and effect from early territorial days.

We have heretofore mentioned the fact that there was no bid by any Montana concern. This conclusion is founded on the proposition that the State Publishing Company, by reason of merely bidding on one part of the proposal, did not submit what constituted a bid.

It is the general rule that one proposing to contract for the doing of public work must substantially conform to the specifications in the proposal. On pages 836 et seq. of 65 A. L. R. will be found many citations to support the rule, among which are the following: "In contemplation of law, a company whose bid does not conform to the advertised requirements for the doing of a public work is not a bidder." (*Chicago Sanitary Dist.* v. *McMahon & M. Co.*, 110 Ill. App. 510.) "There can be no question," said the court in *Andrews* v. *Detroit*, 233 Mich. 79, 206 N. W. 514, 515, "that the bid must conform to the specifications, and the contract to both." "A bid to furnish public supplies should respond to the advertisement for bids, and embrace all the articles therein named." (*State ex rel. Whedon* v. *York County*, 13 Neb. 57, 12 N. W. 816, 820.) "A material conflict, to the disadvantage of the city, between a detailed specification furnished with a proposal and the plans and specifica-

338

tions on which proposals were invited by the municipality, renders the proposal invalid." (*Moreland* v. *Passaic*, 63 N. J. L. 208, 42 Atl. 1058.) It was said in *Chippewa Bridge Co.* v. *Durand*, 122 Wis. 85, 99 N. W. 603, 106 Am. St. Rep. 931, that substantial compliance with all the charter requirements as to a bid is essential to enable the city council to consider it.

The next attempt to get section 381 out of the way is the ██ allegation and the contention that it conflicts with section 20 of Article XV, and section 26 of Article V of the Constitution of Montana, and is therefore invalid and void. In measuring any statute by the Constitution to determine whether or not the statute is valid, many well-established rules of law must be taken into account. This court has repeatedly followed, in substance, the rule laid down in *Hale* v. *County Treasurer*, 82 Mont. 98, 265 Pac. 6, 8, where it was said: "Every reasonable doubt must be resolved in favor of the legislative action. The court must determine not whether it is possible to condemn, but whether it is possible to uphold the Act which is attacked, every presumption being in favor of its validity. The statute will not be declared invalid unless, in the judgment of the court, its unconstitutionality is shown beyond a reasonable doubt." (See, also, *State ex rel. Gebhardt* v. *City Council*, 102 Mont. 27, 55 Pac. (2d) 671; *State ex rel. Berthot* v. *Gallatin County*, 102 Mont. 356, 58 Pac. (2d) 264; *State* v. *Driscoll*, 101 Mont. 348, 54 Pac. (2d) 571; *State ex rel. City of Missoula* v. *Holmes*, 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581; *State* v. *Stark*, 100 Mont. 365, 52 Pac. (2d) 890; *State ex rel. Du Fresne* v. *Leslie*, 100 Mont. 449, 50 Pac. (2d) 959, 101 A. L. R. 1329; *O'Connell* v. *State Board of Equalization*, 95 Mont. 91, 25 Pac. (2d) 114; *State ex rel. Tipton* v. *Erickson*, 93 Mont. 466, 19 Pac. (2d) 227; *State ex rel. Public Service Com.* v. *Brannon*, 86 Mont. 200, 283 Pac. 202, 67 A. L. R. 1020.)

Counsel argue these two contentions under the same heading and are neither lucid nor logical in the application of the provisions of the Constitution to the facts involved. Cases are cited tending to show that the legislature may not enact special or local laws, and an attempt is made to show that section 381 con-

flicts in that particular with the Constitution. It is said: "Section 381 is as much a special Act, franchise, privilege and immunity as if it had the name of Bancroft-Whitney Company in the statute." This statement is obviously made on the assumption that no one could produce the stereotype matrices necessary to contract to furnish the old, back numbers of the Montana Reports except Bancroft-Whitney Company, while the fact is the production of such matrices is open to the world. Anyone may produce the stereotyped matrices necessary for any one or all of the 103 volumes of the Montana Reports now extant, and then be in a position to compete with any and all persons who might or should bid on furnishing the state the reports desired. Bancroft-Whitney Company, over a long period of years, has made the investment and prepared and preserved such matrices, and for that reason, and that alone, appears to have a practical monopoly of furnishing the Montana Reports. It is not a monopoly that contravenes any provision of the Constitution, but a monopoly of equipment which that company has produced by its own enterprise and at its own cost. Anyone is free to take the same course if he chooses to pay the cost of having the matrices made. Counsel's contention is not supported by either law or facts. The argument on the constitutionality of section 381 is obviously a lame attempt to evade by strained construction the effect of a statutory provision which has, in effect, been on the statute books for more than half a century. To subscribe to the contentions of relators, this court would have to disregard and nullify practically every rule of statutory construction that maintains in this and practically all other jurisdictions.

Relators' contention that others than Bancroft-Whitney Company are prohibited by the copyright laws from publishing the old Montana Reports is entirely without merit. Anything contained in an opinion prepared and published by the court cannot be copyrighted. This has been the law since the Supreme Court of the United States said in *Wheaton* v. *Peters*, 8 Pet. 591, 11 Curtis, 223, 237, 8 L. Ed. 1055, that "the court are unanimously of the opinion that no reporter has or can have any copyright in the written opinions delivered by this court;

and that the judges thereof cannot confer on any reporter any such right." In *Banks* v. *Manchester*, 128 U. S. 244, 253, 9 Sup. Ct. 36, 40, 32 L. Ed. 425, where the court had under consideration the right of the reporter of the Ohio Supreme Court to copyright that court's decisions, it was said: "The question is one of public policy, and there has always been a judicial consensus, from the time of the decision in the case of *Wheaton* v. *Peters*, 8 Pet. 591, [8 L. Ed. 1055] that no copyright could, under the statutes passed by Congress, be secured in the products of the labor done by judicial officers in the discharge of their judicial duties. The whole work done by the judges constitutes the authentic exposition and interpretation of the law, which, binding every citizen, is free for publication to all, whether it is a declaration of unwritten law, or an interpretation of a constitution or a statute."

The question of copyrighting court decisions was ably discussed and the rule in *Wheaton* v. *Peters*, supra, reiterated in *Callaghan* v. *Myers*, 128 U. S. 617, 9 Sup. Ct. 177, 32 L. Ed. 547, where it is said, in substance, that the reports of court decisions cannot be copyrighted by anyone, but the publisher may copyright any part of a published decision that represents his own labor in the production, such as headnotes, statements of each case, and arguments of counsel. No part of a decision as handed down by the court, or anything made a part of the decision when it is sent to the publisher by the court, can be copyrighted. This confines the part that may be copyrighted by the publisher to such matter as is usually found on the unnumbered sheets in the forepart of each volume, the comments contained in footnotes made by the publisher, and such matter would be valueless to any other publisher who chose to publish court decisions. The question is too clearly established contrary to the contention of relators to warrant further consideration.

Some two weeks subsequent to the hearing in the proceeding at bar, the Attorney General filed with the clerk a "Supplementary Memorandum," calling the court's attention to the provisions of section 30, Article V, of the Constitution of Montana, wherein it is provided, amongst other things, that certain

contracts therein mentioned must be approved by the Governor and State Treasurer before such contracts become binding and operative. In any litigation between parties questions not in issue at the time of the hearing will not be considered by the court, but, for the reasons heretofore stated, strict observance of the rules has not been required in this proceeding. The members of the court are of the opinion that the legislative assembly imposed an obligation upon them to see that the Montana Reports are published by contract, and that it is obligatory upon the court to see that the contract conforms to law, even though, as here, there is nothing before us to show that the Governor and State Treasurer have refused to approve the contract or that it has been presented to them for approval. We are of the opinion that there is nothing in section 30 of Article V that in any way relates to the contract under consideration. Chapter 44, supra, is a clear legislative mandate to the members of this court to prepare the data and contract for the publication of the court's decisions in the form of Reports, and, unless that mandate is clearly in conflict with some provision of the Constitution, the legislative Act is not to be declared invalid and inoperative; in other words, "its unconstitutionality [must be] shown beyond reasonable doubt" (*Hale* v. *County Treasurer*, supra), before it will be so declared.

Section 30 of Article V is as follows: "All stationery, printing, paper, fuel and lights used in the legislative and other departments of government, shall be furnished, *and the printing, and binding and distribution of the laws*, journals, and department reports and other printing and binding, and the repairing and furnishing the halls and rooms used for the meeting of the legislative assembly, and its committees, shall be performed under contract, to be given to the lowest responsible bidder below such maximum price and under such regulations as may be prescribed by law. No member or officer of any department of the government shall be in any way interested in any such contract; and all such contracts shall be subject to the approval of the governor and state treasurer."

We have italicized the part of the section that relates to the printing and binding of the "laws." It appears entirely clear to us that the obvious intention of the framers of the Constitution was to direct the legislative assembly as to the mode of printing and binding its Acts, along with the journals of the two houses and the reports of executive departments which the law requires each department shall make to the assembly at each session. In other words, the "laws" mentioned in section 30 are the session laws or statutes enacted at the current session by the assembly, not the decisions of this court. Any doubt that might exist about this construction of section 30, Article V, as being correct, is eliminated by section 32 of Article VIII, which provides: "The legislative assembly may provide for the publication of decisions and opinions of the supreme court." Chapter 44, supra, is the legislative enactment making the provision for the publication suggested in the last section of the Constitution mentioned. Section 30 of Article V clearly does not apply to the publication of the Montana Reports; neither is there any material conflict between sections 283.1 and 381 of the Codes, so far as it affects the contract in question.

Having considered all the questions raised by the pleadings and all those argued, and the supplemental memorandum submitted by the Attorney General, and finding no material irregularity that affects the contract entered into by the members of the court for publishing the court's decisions, the petition for a writ of injunction to restrain the Secretary of State from purchasing for the state copies of the reports so authorized published is denied and the proceeding dismissed.

ASSOCIATE JUSTICES STEWART, ANDERSON and ANGSTMAN concur.

MR. CHIEF JUSTICE SANDS, Dissenting:

This is an original proceeding to determine the validity of that certain contract heretofore on the 17th day of July, 1937, entered into by four justices of the supreme court as the parties of the first part and Bancroft-Whitney Company, a corporation

of California, party of the second part. The whereas clause of the contract suggests that it is made under the provisions of sections 378 to 384, inclusive, and section 283.1, Revised Codes of Montana of 1935. The contract presumes, at stated prices, to provide for an option to the state and to its citizens for the printing, binding, and publication of the volumes of the Montana Reports for the next six years; and further it provides for the sale to the state and to individuals of all back volumes of Montana Reports at prices named. The contract also further presumes to provide for the preservation, in fire-proof vaults, of matrices of all volumes to date so that the same could be reproduced on short notice.

The contract is presumed to be signed by the justices of the supreme court on behalf of the state, and by Fred B. Moss, president, and M. A. F. Madison, secretary, of the Bancroft-Whitney Company, recited in the contract to be a corporation of California. As no suggestion is made that the company is authorized to do business in Montana, we may presume that the recital of its place of business as California excludes its business situs from the state of Montana; that is, we conclude that it is a foreign corporation doing business in Montana without having acquired a situs in the state.

Probably the first question that confronts us is that of the authority of a foreign corporation to do business in the state without compliance with our laws. That the Bancroft-Whitney Company, in making a contract to deliver books in Montana for a period of the next six years at stated prices, delivery and payment therefor to be made in Montana, is doing business in Montana under every intendment of our statute, seems certain and settled. The question then arises as to whether this state can, under our Constitution, make contracts of this character binding upon the state. Certainly, there is no constitutional or statutory provision directly authorizing such contracts. If there is any implied authority so to do, it must arise from necessity. Such necessity has not been made to appear, nor is it alleged that such necessity exists. Therefore, we seek in vain for au-

thority to make a contract with a foreign corporation not authorized to do business in the state.

We assert this principle of law that corporations, being a creation of law, have only such authority as is granted to them, no implication arises that they have authority not specifically granted. The question reaches the vitals of contract procedure. Probably because of its simplicity it is not often mentioned. In this instance, the contract proceeds upon the general presumption that a corporation may come into a state and do business therein with the state or with the citizens of the state with the same right and presumption of authority as a natural person, a right that I do not concede. The subject invites extensive argument but the circumstances of this case do not require that argument. Therefore, I pass it with the foregoing statement.

Second, the contract assumes to present a contract covering a period of six years. It is the only state contract I have in mind (and I assert with confidence, the only one attempted in the state) that covers a longer period than two years unless specifically authorized by definite constitutional provision. (See section 12, Article XII, Constitution of Montana.)

If we can make a proviso for payment not exceeding two years, how can we make the contract to cover a longer period? To ask the question is to answer it, and I think it is safe to say that this contract could under no circumstances extend for a period longer than two years. If we cannot make such contract for a longer period than two years, it may, perhaps, be argued the Bancroft-Whitney Company would be presumed to understand that such is the law and it would necessarily follow that it would be presumed as a two-year contract only.

If such is the case, may we assume that the bond is defective which presumes to cover a six-year period, a different contract in an important essential from that signed by the parties, and guaranteed by the bonding company. A contract that might be limited to a two-year period might be presumed to bind the principals, but might not be effective when considered as binding third parties. In all events, it would appear to be unwise to

make a contract for six years that can be legally effective for only two years.

Third, referring now to the provisions of the contract which recite the fact that the supreme court justices caused the publication of notice of intention to let the contract in the "Helena Independent," such publication was in effect not made, but was made by the state purchasing agent, and the recital in the contract is incorrect in the light of the facts. However, if we hold, as I think we must, that the advertisement should be made in the name of the state purchasing agent, we must then consider how it came into the hands of the justices of the supreme court. Were they acting as officers, or in what capacity were they acting? The Constitution of the State, section 1, Article VIII, provides: "The judicial power of the state shall be vested in the senate sitting as a court of impeachment, in a supreme court, district courts, justices of the peace, and such other inferior courts as the legislative assembly may establish in any incorporated city or town."

Section 35 of that same Article defines the powers of the justices: "No justice of the supreme court or district judge shall hold any *other public office* while he remains in the office to which he has been elected or appointed." Is not this another office?

On the other hand, we have section 32 of the same Article which provides: "The legislative assembly may provide for the publication of decisions and opinions of the supreme court." Possibly my associates consider this provision authorizes the legislature to delegate such authority to the supreme court justices, but the authority would be very questionable at least, particularly in view of contradictory legislative provisions which delegate this authority more appropriately to administrative officers. Why digress from the general stated rule limiting the authority of justices to duties within their line. Article VIII, section 35, is sufficient and should be final.

Expressing myself generally, I am opposed to this contract as an attempt to grant a practical monopoly to a foreign corporation that cannot be in any manner practically controlled by our

courts. The contract sought to be made among other things attempts to provide for the sale of law books, i. e., Montana Reports, to private citizens at a fixed price, a procedure which may tend to save the private purchasers of these books some money in the long run, but it penalizes the state by providing for such purchases of its books at an excessive price and is at best an undesirable species of contract. It could not be enforced by a private citizen in any practical way in the event of a controversy. But in particular its monopolistic tendency should be discouraged by the state and particularly by the supreme court of the state, which necessarily understands the monopolistic character of this contract.

In view of the fact that it does not compel private citizens to purchase these books, it cannot be definitely and directly characterized as a monopoly. But its effect so closely approaches monopoly that the practice should not be approved and thereby encouraged by this supreme court. If a law should be enacted providing for the purchase by the state of these matrices, either at the present time or at the option of the state at some future time, under circumstances that would be fair to the state, subject to use by any printing concern in or out of the state, such an arrangement would place the people of the state of Montana in an independent position, although the necessity for these reprint matrices is greatly overrated.

Let us assert our independence now while we may do so, and give our own printing concerns and our own printers a fair opportunity to compete.

With these observations I express my dissent and express the hope that this contract will be rejected and the matter taken up by the next legislature in a constructive, businesslike manner. The damage resulting from a failure to print the volumes of the Reports that would ordinarily come out in the next two years would not work a hardship upon anyone. Unless we do assert ourselves, the matter will probably drag on for many years in its present unsatisfactory manner.