WILLIS JOHNSON, JOHN R. WHITE AND ELBERT
T. JOHNSON

*vs.*

WILLIAM LUERS, R. P. WATTS AND THOMAS P.
LITTLEPAGE.

*Constitutional law : statutes; signing of bills; Governor's power
and duty; time for presentation of bills. Municipalities:
charters; power of Legislature over——; apportion-
ment of road taxes. General Acts and special
local Acts. Elections : municipal——;
submission of charter for
ratification.*

The duty imposed on the Governor, by section 17 of Article 2
of the Constitution, of signing a bill which has been passed by
the Legislature, within six days (Sundays excepted) after it
shall have been presented to him, dates only from the time it is
officially presented to him for his signature by the chief clerk
of the House or secretary of the Senate, respectively, and not
from the time when such a bill was handed to the Governor by
such clerk or secretary, not for presentation to the Governor,
but merely to be held until such bill, with others, could be ex-
amined by the Attorney General, to be by him returned with
his comments to the chief clerk of the House or secretary of
the Senate, and by such chief clerk or secretary to be then pre-
sented formally to the Governor for his action.     pp. 526-527

In incorporating a municipality, the Legislature is not limited to naming commissioners for the new corporation to persons then residing within the proposed corporate limits, or who are then technically qualified to vote as of such corporate limits, and such action on its part is not a matter for review by the courts.                                                        p. 529

Acts incorporating municipal corporations may be made binding upon those within the proposed limits without consent, or only upon consent, as the Legislature may determine.

                                                        pp. 530, 532

Where, in providing for the incorporation of a municipality, the Legislature provides that the question shall depend upon the vote of those living within the prescribed limits, it is not necessary that the Act should provide for the registration of such persons.                                                p. 533

Such an election need not be held under the general election laws of the State.                                        p. 534

The fact that the commissioners named in such an incorporation law are also named as judges of such election does not invalidate the act of incorporation.                        p. 533

It is no objection to such a law that in providing for the submission of the question to a popular vote, it fails to provide or give directions as to the form of ballot that should be used.

                                                        p. 533

A provision in such a law that the Board of Road Directors of the county shall pay to the commissioners of the municipality three-fourths of the taxes levied against property within the town for public roads and bridges, is not unconstitutional.

                                                        p. 533

In general, the provisions of a special statute prevail over the general law.                                        p. 534

*Decided December 13th, 1916.*

Appeal from the Circuit Court for Prince George's County. In Equity. (BEALL, J.)

The facts are stated in the opinion of the Court.

The cause was argued before Boyd. C. J., Briscoe, Pattison, Urner, Stockbridge and Constable, JJ.

*James W. Owens* and *Alan Bowie,* for the appellants.

*Joseph Addison* (with whom was *F. Snowden Hill* on the brief), for the appellees.

Boyd, C. J., delivered the opinion of the Court.

The appellants filed a bill of complaint by which they sought to enjoin the appellees from holding an election under the provisions of Chapter 426 of the Acts of 1916. The title of that Act is: "An Act for the incorporation of the town of Bowie, in Prince George's County, and for the submission of this charter to the qualified voters of said town for their adoption or rejection and for the repeal of all acts or parts of acts inconsistent therewith." A number of grounds for attacking the act are set out in the bill of complaint, and we will for the most part consider them in the order in which they are there presented.

First. The General Assembly adjourned on the 3rd of April, 1916, and the Act was signed on the 18th of that month. It is contended that the Governor did not sign the bill within six days after it was presented to him, and hence it did not become a valid law. Section 30 of Article 3 of the Constitution provides that: "Every bill, when passed by the General Assembly, and sealed with the Great Seal, shall be presented to the Governor, who, if he approves it, shall sign the same in the presence of the presiding officers and chief clerks of the Senate and House of Delegates." Section 17 of Article 2, after providing that "every bill which shall have passed the House of Delegates and the Senate, shall, before it becomes a law, be presented to the Governor of the State; if

he approve he shall sign it, but if not he shall return it with
his objections to the House in which it originated," etc., and
after directing what shall be done in the event of a veto, then
provides, "If any bill shall not be returned by the Governor
within six days (Sundays excepted), after it shall have been
presented to him, the same shall be a law in like manner as
if he signed it, unless the General Assembly shall, by ad-
journment, prevent its return, in which case it shall not be a
law."

In *Lankford et al.* v. *County Commissioners,* 73 Md. 105,
this Court held that a bill regularly passed by the Legislature,
and sealed as directed, could be constitutionally presented to
the Governor, and signed by him, after the end of the session
of the Legislature, provided he signed it within six days from
the time the bill was actually presented to him. The bill of
complaint alleges that this bill was in the Executive Chamber
under the control of the officials connected therewith more
than the prescribed limit of time, and that, 'while it may not
have been presented directly to the Governor, it was in his
custody, or his representatives,' a much longer period than
that prescribed by the Constitution, and hence, that the sign-
ing of the same was contrary to law and that the said law is
a nullity."

The evidence is all to the effect that the bill was not pre-
sented to the Governor before April 14th. The Governor
testified that there were about 500 bills which were passed
within the last two or three days of the session, and, seeing
that it would be impossible for him to examine them, either
by himself or with the aid of the Attorney General, or
attorneys he might call upon, he asked the Chief Clerks of
the House and Senate if it could be arranged not to present
all of them at one time, and to have the Attorney General see
them while they remained in their control, which they
arranged to do. There are three rooms in the Executive
Chamber, used by the Executive Officials of the State, one
is the reception room and the office of the Secretary of State,

the second is occupied by Mr. Hardy, who is the chief clerk in the Governor's office, and the third is the Governor's private office. The bill in question was a house bill, and hence was in charge of Mr. Almoney, Chief Clerk of the House. The Attorney General had a desk next to Mr. Hardy, and he testified that the bills "were brought for me to examine them, otherwise I would have to go down to Mr. Almoney's office in the bottom of the State House, where I did not have any conveniences, such as law books, stenographic help and so on, and where I had no desk." He said: "What Mr. Almoney did do was to permit me to have possession of the bills for a period long enough for me to examine them. The bills would come into Mr. Hardy's office in instalments, sometimes 30 or 40, sometimes more. I had established a desk right next to Mr. Hardy, and I was there all the time. When Mr. Almoney would bring bills up in instalments he would hand them to Mr. Hardy and Mr. Hardy would at once pass them over to me at the next desk. I would then keep them and make any notes of them that occurred to me, and when I got through I would say, Mr. Hardy, this batch of bills is ready for the Governor; * * * and then Mr. Almoney, who had been responsible for the bills all the time, would for the first time present them to the Governor on the days shown in his record, so that Mr. Almoney never presented the bills to anybody except the Governor." The Attorney General said he was there three weeks, that sometimes Mr. Almoney would hand him the bills in Mr. Hardy's presence, and stated: "Then let me add, that after Mr. Almoney got back the bills from me and presented them to the Governor on the dates shown in his Record, the Governor always acted on them within six days after their presentation to him." He said he remembered this particular bill, as Mr. Owens, the attorney for appellants, had written to him about it before it came into his possession, and he was on the lookout for it, that he did not know the date Mr. Hardy presented it to him, that it might have been the fourteenth of April and it might

have been earlier, but he remembered that Mr. Hardy, in
tho presence of Mr. Almoney, gave him a. batch of bills,
including the Bowie bill, and he started to look over them at
once.

The testimony of Mr. Almoney, the Attorney General, the
Secretary of State and the Governor shows that it was dis-
tinctly understood that Mr. Hardy was not to represent the
Governor in the reception of the bills at those times, but Mr.
Almoney simply left them with him for the Attorney Gen-
eral to examine, and when the latter was through with them
they were returned to Mr. Almoney, who afterwards pre-
sented them to the Governor at the times named in the official
record. The plan adopted was to enable the Attorney Gen-
eral to more carefully examine the bills than would have been
possible if they had been presented to the Governor at once,
and while unnecessary delay in presenting bills to the Gov-
ernor should be avoided, the provision in the statute (now
sect. 1 of Article 41 of the Annotated Code), that "every bill,
when passed by the General Assembly, shall be returned to
the House in which the same originated, and shall, as soon
thereafter as practicable, be sealed with the Great Seal by
the Secretary of the Senate, or Chief Clerk of the House of
Delegates, as the case may be, and presented to the Governor
for his approval" was considered in *Lankford* v. *County Com-
missioners, supra,* and on page 113, JUDGE ALVEY said:
"But these terms 'as soon thereafter as practicable,' are of a
relative and dependent character, to be controlled more or
less by the circumstances of the case, and by no means fur-
nish a definite and fixed rule." As long as the Legislature
postpones the passage of so many bills to the concluding
days, and, as to many, the concluding hours of the session,
it will be impossible for the Governor to give proper con-
sideration to them within six days, if they must be presented
to him as fast as the Secretary of the Senate or the Chief
Clerk of the House can prepare them for presentation. The
evidence is conclusive to the effect that the delivery of the

bills to Mr. Hardy after the adjournment of the Legislature was not intended to be a presentation of them to him as a representative of the Governor, or for the purpose of having him then deliver them to the Governor, but, on the contrary, it was simply to enable the Attorney General to examine them, and, after that was done, to have them returned to Mr. Almoney, Chief Clerk of the House, or to Mr. Webb, Secretary of the Senate—depending upon which house the bill originated in, and Mr. Almoney or Mr. Webb, as the case might be, then presented them to the Governor for his action.

It was said in *Berry v. Balt. Drum Point R. R. Co.,* 41 Md. 446, 462, and repeated in other cases, "where an Act has been duly authenticated and published as law by authority, the presumption is, that all the constitutional solemnities and prerequisites necessary to its valid enactment have been complied with; and this presumption exists until the contrary is clearly made to appear." We might well leave this branch of the case here, but there is nothing in the evidence to show that the Great Seal had been attached to the Act before the 14th of April, the day the Record shows the bill was presented to the Governor. It is rather to be inferred from Mr. Almoney's evidence that it was not affixed before that date, at least that it had not been when the bill was first left with Mr. Hardy. In *Hamilton* v. *State,* 61 Md. 14, it was said by Judge Stone, in speaking for the Court, that there are three things required by section 30 of Article 3 of the Constitution before the duty of the General Assembly ends and that of the Governor begins. "They must pass the bill; they must seal the bill with the Great Seal of the State, and they must present the bill to the Governor, and when all this is done, and not till then, the duty of the Governor begins. All these are conditions precedent to be performed by the Legislature before his constitutional duties imperatively require the Governor to act." The Act therefore can not be declared invalid by reason of the first ground relied on.

Second.   It is contended that Thomas B. Littlepage, one
of the three commissioners named in the Act to serve until
the first Monday in June, 1917, and until their successors
are elected and qualified, did not reside within the limits
of Bowie as prescribed in section 2 of the Act, and was not a
property holder, and therefore was ineligible.   Section 3 of
the Act provides: "That all persons who have resided within
the said town for six months next preceding the day of elec-
tion, or who shall be assessed with three hundred dollars of
real or personal property within said town, and who are
qualified to vote for delegates to the General Assembly of
Maryland, shall elect on the first Monday in June, 1917,
and annually thereafter on the first Monday of June, three
persons to act as commissioners of said town, all of whom
shall have been qualified to vote in a town election in said
town for at least one year next preceding their election."
Sections 19 and 20 are as follows: "Section 19. That this
Act shall not become effective until it shall be submitted to
the qualified voters living within the prescribed limits of said
town, and accepted by a majority of the ballots cast, at an
election to be held for that purpose on the third Monday in
June, 1916.   The polls to be open from three P. M. until
seven P. M.   Sec. 20. That William Luers, R. P. Watts
and Thomas B. Littlepage are hereby appointed judges of
election for the ratification of this charter, and they are
hereby authorized to prepare ballots, provide such place, and
to do other things necessary for the holding of an election
for the ratification of this charter.   They shall give at least
ten days' notice of the time and place of the election by
hand-bills posted in at least five places within the limits of
said town.   After the polls have been closed they shall pro-
ceed immediately to canvass the votes cast, and if a majority
of them are in favor of incorporation, then this charter shall
go into effect, and all Acts or parts of Acts inconsistent here-
with are hereby repealed, and the said William Luers, R.
P. Watts and Thomas B. Littlepage shall be and comprise

the Board of Commissioners until the first Monday in June, 1917, and until their successors are elected and qualified. And if the majority of votes cast at said election shall be against incorporation, then this Act shall be null and of no effect."

It was admitted that Mr. Littlepage does not reside within the proposed limits of Bowie, but that he is the owner of more than $300.00 worth of property within the limits, which he acquired by deed dated May 23, 1916, although it is not stated that he was assessed with it. As the Act could not take effect until the third Monday in June, 1916, the date of the election, he had then complied with its requirements as to the qualifications for a Commissioner, if he was assessed for the property he owned within the limits of the town. But that would seem to be immaterial for, as the Legislature saw proper to name him as one of the commissioners until the first election, to be held in June, 1917, we know of no reason why it could not do so, even if he was not a resident, or not assessed with $300.00 worth of property. We are not aware of any provision of law that would have prohibited the Legislature from doing so. There is nothing in the statute requiring the commissioners named by the Legislature to be residents or assessed as provided for in Section 3. If Mr. Littlepage was assessed with $300.00 worth of property one year before the first Monday of June, 1917, and was qualified to vote for delegates to the General Assembly, he will be eligible to be elected as a commissioner at the first election of those officers to be held under this charter, but regardless of that, as we have said, we find nothing in the Act and are aware of no provision of law which prohibited the Legislature from naming him as one of the commissioners. That was a matter for the Legislature, not subject to the review of the Court.

The only reference to Municipal Corporations in the Constitution, excepting Baltimore City (we are not speaking of such corporations as the counties) is in section 48 of

Article 3, which provides, "Corporations may be formed under general laws; but shall not be created by special act, *except for municipal purposes,*" etc. It is well settled that Acts incorporating municipal corporations may be made binding upon those within the limits, without consent, or only upon consent, as the Legislature may determine. "These are laws and, as such, are imperative and binding, according to their terms, without any consent, unless the Act is expressly made conditional. * * * Over such corporations the Legislature, except as restrained by the Constitution, has entire control," 1 *Dillon on Mun. Cor.* (5th Ed.), section 69. Again, in section 92 of that volume, it is said: "Subject to Constitutional limitations presently to be noticed, the power of the Legislature over such corporations is supreme and transcendent; it may, where there is no Constitutional inhibition, erect, change, divide and even abolish them at pleasure, as it deems the public good to require," and in section 98 it is said: "It must now be conceded that the great weight of authority denies *in toto* the existence, in the absence of special constitutional provisions, of *any inherent right of local self government which is beyond legislative control.* The Supreme Court of the United States has declared that a municipal corporation in the exercise of all its duties, including those most strictly local or internal, is but a department of the State. The Legislature may give it all the powers such a being is capable of receiving, making it a miniature State, within its locality; or it may strip it of every power, leaving it a corporation in name only; and it may create and recreate these changes as often as it chooses, or it may itself exercise directly within the locality any or all the powers usually committed to a municipality."

In the notes the learned author cites many cases, including *Baltimore v. State,* 15 Md. 376; *Pumphrey v. Baltimore,* 47 Md. 145; *Talbot County v. Queen Anne's County,* 50 Md. 245; *Revell v. Annapolis,* 81 Md. 1, and *Baltimore v. Keeley Inst.,* 81 Md. 106. In 15 Md. 376, *supra,* a stat-

ute providing for a permanent police for the City, under
the control of a Board of Police, consisting of commissioners
appointed by the Legislature, was held to be constitutional
and valid, notwithstanding the provisions in the Constitution
in reference to Baltimore City. That case was argued by
some of the ablest attorneys of the Maryland Bar—the argu-
ments and opinions occupying 117 pages of that volume.
JUDGE TUCK said, on page 453, that: "It involves considera-
tions of expediency and public policy of which the Legisla-
ture is the exclusive judge, and which, we must assume,
were fully weighed and determined when the Act was
passed." Again he said (page 455): "If the Legislature
had power to make the appointment, we can not say that it
ought not to have been exercised, any more than we could,
with propriety, pass upon the correctness of its judgment in
selecting these officers." Indeed as late as 1898, when the
present charter of Baltimore City was adopted, the Legisla-
ture appointed the Police Commissioners—although that has
since been changed, and the Governor now appoints them.
The other cases cited by JUDGE DILLON also show the posi-
tion of this Court and our predecessors in reference to the
powers of the Legislature in dealing with Baltimore and
other cities. If such powers can be exercised in reference to
Baltimore City, surely there can be no question about the
absolute right of the Legislature to say who shall be commis-
sioners of a municipality such as Bowie, and when it has
named them, it is not for the Court to interfere.

In *Hanna* v. *Young*, 84 Md. 179, an Act was under con-
sideration which amended the charter of Bel-Air by provid-
ing that the judges of election should, as a condition prece-
dent, require of each person offering to vote at such election,
to show that he was assessed with $100 worth of real or per-
sonal property on the tax books of such town before he was
entitled to vote. In passing on the question JUDGE ROBERTS,
who delivered the opinion, said: "But, as already observed,
the Constitution (Art. 3, sec. 48) only in general terms

authorizes the creation of corporations for *municipal purposes,* and leaves to the Legislature the enactment of such details as it may deem proper in the management of the concerns of the corporation, or which may be regarded as beneficial in the government of the same." Again, he said: "In the creation of a new municipality, the Constitution devolves upon the General Assembly the entire duty of giving vitality to and of organizing and fostering the body corporate without any other constitutional regulation than the mandate to provide for the system itself. It is therefore the mere creature of legislative sanction and the subject of statutory regulation."

Without citing other authorities, it would seem to be perfectly clear, that the Legislature had the right to name the commissioners, and it matters not whether Mr. Littlepage was then technically qualified to vote, or to be voted for, as a commissioner at the election to be held in June, 1917, or thereafter. The question submitted at the election to be held the third Monday of June, 1916, was whether Bowie should be incorporated.

Third. It was suggested that there was no provision for registration of those living within the prescribed limits, but it will be found that such is the case with many, perhaps most of the small towns and villages of the State. The Legislature has the right, as we have seen, to incorporate a town *without the consent* of those within the limits, and when it determined to submit the question, it had the right to prescribe the terms. Indeed, until the town was incorporated it may have been thought unnecessary to incur the expense of a registration, for if the incorporation did not carry, the books and lists for registration would have been of no further use. We are not informed as to the number of people living within those limits, but it is a small place and those interested could readily ascertain, if they did not already know, whether a party offering to vote was within the prescribed limits. Almost any intelligent person familiar with

such a locality and the people living there could soon ascertain who were entitled to vote. So far as appears by the charter in the Local Code of 1888 and the Act in question in 84 Md., *supra,* it is doubtful whether there was any registration in Bel-Air at the time that case arose, but however that may be, we have no doubt that the Legislature had the power to provide for the submission of the question as to whether Bowie should be incorporated as was done by this Act.

Fourth. Then the bill is objected to because the three persons named as commissioners for the first year were also made judges of election. But the Legislature knew that, as it named them for both places, and however much we might disapprove of such a course, we are not authorized to strike down the Act for that reason. It would not be allowed at an election held under the General Laws, but those laws did not apply to this election—certainly not in regard to a registration for the election in June, 1916.

Fifth. Another objection stated was that the County Commissioners are required to pay over to the Commissioners of Bowie all of the road tax collected in the corporate limits. The provision in fact is that the Board of Road Directors shall pay the Commissioners of Bowie three-fourths of the taxes levied against the assessable property within the town for public roads and bridges (section 18). Some such provision in charters of towns is not unusual, as may be seen by reference to the case of *Ellicott City* v. *Howard County,* 127 Md. 578. It is true that what was sued for was not recovered in that case, but it was for the reasons stated in the opinion, and not because of any intimation of want of power in the Legislature to so provide. The same may be said of Section 18A in reference to liquor licenses.

Sixth. It is said that there is no provision as to how the ballots to be voted were to be prepared. Section 20 authorizes the judges of election to prepare them, and as it did not state what the form should be, that was left to the judges;

their discretion, of course, to be reasonably and properly exercised. If they are men of ordinary intelligence, they ought to have known how such ballots should be prepared, so as to get a fair expression from those entitled to vote.

Seventh. The answer to the suggestion that the Act violates the provisions of Article 33 is that the election was not to be held under that article. It can not properly be said to have been a municipal election. It was simply a submission to those within the prescribed limits authorized by the Act to vote, to determine whether or not there should be a municipality. Moreover, the Act itself repealed all Acts or parts of Acts inconsistent with it. Of course that only meant that any inconsistent Act should be repealed in so far as it affected this Act and for the purpose of this Act. It was not the intention of the Legislature that any part of Article 33 of the Code should be repealed, so as to affect the provisions of that article as applicable to elections not provided for by this Act. Indeed if there had been no repealing clause, in so far as there is any inconsistency, this Act would prevail.

We have thus considered this case at length as the attorneys forcibly and earnestly presented their views, and there are undoubtedly some very unusual and peculiar provisions in the Act. But as we are satisfied that there is nothing in it for which we would be authorized to reverse the decree of the lower Court, it will be affirmed.

*Decree affirmed, the appellants to pay the costs.*