HOWARD W. JACKSON ET AL. *v.* WILLIAM S. NORRIS
HOWARD W. JACKSON ET AL. *v.* HATTIE B. DALY
[Nos. 3, 4, January Term, 1938.]

580

*Decided December 8th, 1937.*

The causes were argued, as of October Term, 1937, before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Paul F. Due,* for the Voting Machine Board.

*Arthur W. Machen* and *Wendell D. Allen,* with whom were *Armstrong, Machen & Allen* on the brief, for the Automatic Voting Machine Corporation.

*Charles C. G. Evans, Deputy City Solicitor,* and *William H. Marshall, Assistant City Solicitor,* submitting on brief, for the Mayor and City Council of Baltimore, and R. Walter Graham, Comptroller.

*Charles G. Page,* for William S. Norris.

*Isaac Lobe Straus* and *Willis R. Jones,* for Hattie B. Daly.

PARKE, J., delivered the opinion of the Court.

The appeals and cross-appeals on this record present questions in relation to the validity of the contract of

purchase of voting machines for use, pursuant to the terms of chapter 94 of the Acts of 1937, in the primary and general elections to be held in Baltimore City, a political division of the state.

The employment of voting machines in primary and general elections was controlled until 1937 by sections 222-224 of article 33 of the Code (1924) of Public General Laws, and added sections 224A-224D of the Acts of 1933, ch. 228, and Acts of 1935, ch. 532 (Code (Supp. 1935) art. 33, secs. 224A-224D). The effect of the statutory law was to grant to the respective boards of election supervisors in the state a discretionary power to introduce the machines, with two modifications which required the board in Baltimore City to use, in all future elections after the passage of chapter 228 of the Acts of 1933, the machines that had been theretofore purchased by that municipality and were then available for use, and which, subject to the approval of the local board of county commissioners, made a permissive installation of the machines in two specified election districts of Montgomery County. *Supra.* In 1937, chapter 94 was passed as an emergency law within the scope and meaning of chapter 5 of the Laws of Maryland, Special Session, 1936, which authorized the borrowing of money by the Mayor and City Council of Baltimore for specified exigent purposes. The statute of 1937 was made effective from the date of its passage. The enactment declares the use of voting machines mandatory in all elections in Baltimore City after January 1st, 1938, unless a voting machine becomes unavailable because of an accidental happening; and leaves discretionary the installation of voting machines in the counties. The statute further prescribes, with respect to Baltimore City, the general features and facilities of the machines; the powers, functions, and duties of the Board of Supervisors; and many provisons and regulations to assure a fair, honest, and free election; a certain and correct vote; and an accurate count and true return of the result.

The Act of 1937 directs the Board of Supervisors of

Election for Baltimore City to use the voting machines which the municipality has purchased. The members of the Board of Estimates of Baltimore City and of the Board of Supervisors are together constituted a special board, and as such are "authorized, empowered and directed to purchase a sufficient number of voting machines for use in all polling places throughout the City of Baltimore." Section 224A. The expenses incurred by this particular board and the cost of the machines are directed to be paid upon the requisition of this board, and after audit by the comptroller of the city. The board is empowered by a majority vote of its members to require such supplementary specifications to those set forth in the act as shall be decided to be proper for the voting machines acquired or to be acquired by this board, and to select in their discretion the type and make of the machines. The special board is further given the authority, in its discretion, to employ engineers or other skillful persons to advise and aid them in the exercise of the powers conferred and duties imposed. After their purchase the machines are to be delivered to the Supervisors of Election, who shall have their control and custody. Wherever possible, these provisions are to be construed in harmony with existing laws. Section 224A. So, it is argued that this Voting Machine Board has no power to make a valid contract to buy the voting machines, unless the machines are purchased through or with the approval of the Central Purchasing Bureau, and in conformity with the promulgated rules and regulations of that bureau, and the statutory requirement of a bond to the State, if the seller sells in competitive bidding. Code, art. 78, secs. 1-8.

The Central Purchasing Bureau was created by chapter 184 of the Acts of 1920, for the purpose of having the various institutions of the State buy through a central agency, and thereby secure lower prices and better quality and results because of the volume bought, of the standardization of materials, supplies, and articles customarily required, and of the check on waste, fraud, and

extravagance. The functions of the executive and administrative officers who compose the personnel of the bureau are indicative of the legislative purpose; and there is no suggestion that the boards of election supervisors, which are engaged in a peculiarly important political office, were designed to be grouped with executive official boards, departments, and institutions charged with the administrative activities of the State, so that the equipment of an election should cease to be provided by the officials immediately responsible for the purchase, control, and custody under the law of the election machinery and supplies, and be bought by the Purchasing Bureau.

The statutes impose weighty duties upon election officials in order that trickery and fraud may be prevented and freedom and purity of elections may be secured. Their grave responsibility is accompanied by criminal liability denounced by the statute for a failure to fulfill their functions as exacted by law. Considerations which are founded in public policy reject the suggestion that there is an implied legislative intention to divide the authority of the supervisors of election by the interposition of an intermediary, and, notwithstanding, retain the full measure of their liability. So, both before and since the passage of the statute with which the bureau began, the several boards of supervisors of election throughout the state have been authorized to provide all necessary ballots, ballot boxes, and booths; registry books, poll books, tally sheets, blanks, and stationery. The expenses of the supervisors of election for the purchase of these and all other necessary supplies have been uniformly paid by Baltimore City or by the respective counties. Code, art. 33, secs. 3 (as amended by Acts 1933), ch. 417, 16, 62, 66; Acts 1924, ch. 581, secs. 54-61; 1922, ch. 225; and 1933, ch. 228; 1935, ch. 532 (Code Pub. Gen. Laws 1924, art. 33, secs. 16, 62, 66; Code (Supp. 1935) art. 33, secs. 3, 54-61, 224A-224D). With respect to the equipment, ballots, ballot boxes, booths, and supplies, either the election law or the supervisors prescribe their kind, quality, and form, and these matters are not otherwise delegable.

It is, therefore, reasonable to expect and to find that, within the terms of the statute which grants and defines the scope and power of the bureau, there is the implied exclusion from its operation of all boards of supervisors of election. The exemption appears from the fact that every state officer, board, department, commission, and institution intended to be included is limited to those whose accounts are payable by the Comptroller of the State out of the amounts appropriated therefor by the General Assembly of Maryland in the Budget Bill. Code, art. 78, sec. 4.

Again, it should be observed that the Act of 1937, ch. 94, creates a new board by combining the members of the Board of Election Supervisors for Baltimore City with the members of the Board of Estimates of Baltimore City. The official body so constituted is formed for the express purpose of determining the type and make, with any specifications supplementary to those required by the act, of the voting machines to be acquired by purchase by this board, and to be paid for by the Mayor and City Council of Baltimore. In the performance of this exclusive function the board is given the authority to inform their judgment by the expert aid and advice of engineers or other skilled persons. These explicit provisions enforce the conclusion that the General Assembly did not intend the full, material, and complete powers of the specially erected board to be rendered meaningless by remitting to the bureau not only the purchase, but also the duty to "determine and formulate standards" of the voting machines. Code, art. 78, sec. 3. If further support of this conclusion were necessary, it is found in the fact that if the bureau should buy the machines, and they be delivered, and the invoice approved by the bureau, the comptroller could not lawfully pay the account, because there are no funds "appropriated therefor by the General Assembly in the Budget Bill," as contemplated by the statute in respect of the Purchasing Bureau. *Ibid.* sec. 4

It is obvious that the contract for the voting machines

is to be made by the board created by chapter 94 of the Acts of 1937, without any recourse to the Central Purchasing Bureau. Nor does the court find that the newly-formed Voting Machine Board, as it may be conveniently called, is within any provision of the Charter and Public Local Laws of Baltimore City, which relate to competitive bidding (Pub. Loc. Laws 1930, art. 4, sec. 14 *et seq.*).

The advertisement and competitive bidding required before a contract may be made for any public work, or the purchase of any supplies or materials, involving an expenditure of $500 or more for the city, or by any of the city departments, subdepartments, or municipal officers not embraced in a department, or special commissions or boards, are made obligatory by sections 14 and 15 of the Charter and Public Local Laws of Baltimore, unless otherwise provided for by the local charter and laws. It is plain that these sections are confined to municipal agencies. It is true that the term "or special commissions or boards" (section 14) is not specifically described as being confined to those of the municipality, but this is the implication of the context, which is clarified by subsequent sections so as to preclude any other rational construction. Thus, in section 25, the Mayor is granted "the sole power of appointment of all heads of departments, heads of sub-departments, municipal officers not embraced in a department and all special commissioners or boards, except as otherwise provided in this Article [Charter], subject to confirmation by a majority vote of all the members elected to the [Second Branch of the] City Council." See sections 22, 27, 28, 30, 31, 36, 222B, 480, 515B, 824A.

The quotation from section 25 and the other sections cited establish that sections 14 and 15 of the Charter do not apply to the contracts made by the Voting Machine Board, which, as has been seen, is not the creature of the municipality, but a statutory board of purely legislative origin, with a large measure of discretion to be exercised as officials of the State in the performance of a function of vital importance to the people of the entire

state. *Norris v. Mayor and City Council of Baltimore* 192 A. 531, 538.

The authority and power granted the Voting Machine Board in the supplementary specifications which it may adopt for the machines; in the selection, in its discretion, of the type and make of voting machines; and in the employment of experts to inform and aid the board in performance of its duties, are provisions which carry conviction that the right of the board to select and buy is intended to be exclusive, and to be exercised according to the best judgment of the board. It follows that the Voting Machine Board is free to buy in good faith machines as it may deem best. It may buy all or some, either with or without competitive bidding. So, if machines are bought, and prove not to answer some requirement, the board may contract, in its discretion, to have the omission rectified. This freedom in contract is requisite to the full performance of the important and difficult duties of the Voting Machine Board.

The constitutionality of this legislation was sustained on appeal in *Norris v. Mayor and City Council of Baltimore*, decided May 26th, 1937, and reported in 172 Md. 667, 192 A. 531, and thereafter the Voting Machine Board, after study, advice, and deliberation, prepared the specifications for the voting machines and advertised for the submission of proposals or bids for furnishing and delivering 910 voting machines and doing certain other work as set forth in the specifications.

The Automatic Voting Machine Corporation and the Shoup Voting Machine Corporation were the two competitors in the bidding. The first corporation offered to furnish and deliver 910 voting machines, known as forty candidate machines of the type and size described in the specifications as type A, size 1, at $826.95 a machine, or a total of $752,524.50; and the Shoup Corporation offered to furnish and deliver similar machines at $1,047 each, or a total of $952,770. The bid of the Automatic Corporation was accepted, and the contract made with the Voting Machine Board on September 8th, 1937. The fol-

lowing day, William S. Norris, a citizen and voter resident in the City of Baltimore, and a taxpayer in said city and state, brought a suit in equity against the eight members of the Voting Machine Board and the Automatic Corporation to annul the contract. On September 18th, 1937, Hattie B. Daly, another citizen, resident and voter of the city and a taxpayer of both city and state, filed a suit in equity against the eight members of the Voting Machine Board, the comptroller of the city, and the Automatic Voting Machine Corporation to have the contract declared illegal and void. The two causes were heard together and testimony was taken by the parties before the chancellor. The separate decrees passed in each suit were adverse to the complainants, except on the ground that the contract was null and void in that the voting machines bought are so constructed as to deny to a qualified voter the right to vote for any person of his choice, because the voter must vote either for the candidates whose names are printed upon the voting machine ballot or not vote. For this reason, the defendants were enjoined from the performance of the contract. From this decree in the first suit, separate appeals were taken by the Automatic Corporation, the members of the Voting Machine Board, the Mayor and City Council of Baltimore; and a cross-appeal from certain portions of the decree was taken by the complainant Norris. Similarly, in the second suit, appeals were taken by all the defendants, and the complainant entered a cross-appeal from certain paragraphs of the decree in that cause. All the appeals in both causes are brought up on one record.

The chancellor found on the testimony that the board had acted throughout in the best faith, without the taint of collusion or other fraudulent or wrongful conduct; and had exercised its discretionary powers after careful and diligent investigation and consideration, and had reached a reasonable conclusion on all matters of fact. The court here is in full agreement with the chancellor on this finding of facts, and so the only inquiry open on this

appeal is whether the acts of the board are within its lawful authority and power. *Fuller Co. v. Elderkin,* 160 Md. 660, 154 A. 548.

For convenience of discussion, the objections on legal grounds to each bill of complaint have been combined in one group. After an elimination of those matters which are within the sound discretion of the board, and which, therefore, are not reviewable, and, for the reasons which have been stated in this opinion, of the contentions that the buying of the machines has to be made by or through the State's Central Purchasing Agency, and that, within the doctrine stated in *Konig v. Baltimore,* 126 Md. 606, 95 A. 478, a proposal or bid may not be accepted under the charter of Baltimore City if it is a departure from those things for which proposals have been, by public advertisement, invited to be made upon prescribed and definite specifications of the things to be bought, there remain in this group many objections. Most of these are in relation to an alleged failure of the accepted voting machines to conform to the requirements of the statute and of the specifications which were adopted by the board.

The specifications required the bidder to build a sample of the voting machines to be built, and to place it in the office of the Supervisors of Election. Before either of the bidders submitted their offers, each installed its sample of a machine. A doubt was expressed before the board whether the machine exhibited by the Automatic Corporation was in compliance with the specifications or the election laws, so another sample machine was provided which differed, as will be later stated, from the first sample. Both these machines were introduced in evidence, and the first will be referred to as Exhibit 1 and the second as Exhibit No. 2. The record has photographic exhibits of material details of these machines. In addition, the two machines, together with a third one, were produced in the appellate court and their operation demonstrated. This third machine, which will be called Exhibit 3, differed from Exhibit 2 in that it was

equipped with a device which afforded the voter the opportunity to write in the name of his personal choice for any office when the name of his 'choice did not appear on the ballot as a candidate for that office.

From the testimony on the record, the court finds, as did the able and experienced chancellor, that many of the objections urged were of a minor nature, which are either not supported by the proof or are shown by an inspection of the machines and equipment in evidence to be groundless. Moreover they relate, in most instances, to details in arrangement and form which, because of the facilities and adaptability of the machines, could be regulated and adjusted by the Supervisors of Election so as to bring them in reasonable conformity with the directory requirements of the statutory law.

There are, however, certain allegations which are relied upon to establish that the type of machines which are bought cannot be used in accordance with the election laws. The first is that if there are three or more candidates who are competitors in a primary election for the same party nomination to a state-wide office, the ballot displayed by the machine shows the name of every candidate more than once. It is asserted that this is a violation of article 33, section 203, of the Code of Public General Laws. In making this contention, its advocates ignore the distinction that section 203 was written for paper ballots and chapter 94 of the Acts of 1937 was drawn with reference to voting machines. So the latter act recognizes and meets the conditions produced by this difference by declaring that the machine shall be in "substantial compliance with the provisions of Section 203," and that all laws or portions of laws in conflict with the provisions of the act are thereby repealed to the extent of such inconsistency or conflict. Acts of 1937, ch. 94, sec. 224-F (d) ; and section 3. The object of the provision of the election law which prohibited the name of a candidate to appear more than once was to prevent a candidate from gaining the advantage of having his name printed more than once, and the evil of a voter marking

his ballot more than once for the same candidate. Where the voter may select in a primary election his first and second choice of the candidate for an office, all types of voting machines carry the name of every candidate more than once, but the difficulty is met, and the same result secured as in the provision of section 203 of article 33 with respect to the paper ballot, by the statute prescribing, and the mechanism of the voting machine assuring, the preclusion of "each voter * * * from voting for any candidate for the same office or upon any question more than once." Section 224-F (e). Thus the General Assembly, by appropriate but different provisions with respect to each method of voting, accomplished the single contemplated result. If there is any conflict, section 203 must be held repealed or modified to the extent of the inconsistency.

The next point for consideration is the contention that in primary elections, where there are three or more candidates for nomination for the same office in the same party primary, the method by which the voter may avail himself of the right to indicate his first and second choice by the ballot presented by the machine bought (Exhibit 1) is illegal. If the voter were to cast a paper ballot, he would receive a ballot with the names of the candidates, and opposite every candidate's name would be printed two squares, with appropriate legends informing him to mark the first choice square for his first choice and the second choice square for his second choice. So, if the voter prefers candidate X for first choice and candidate Y for second choice, he makes his mark in the first choice square opposite X's name, and his other mark in the second choice square opposite Y's name. The voter may do no more than vote a first choice. Should he, however, mark no first choice, but vote in the second choice block, his vote is counted as a first choice vote for the candidate opposite that block, because having made but one choice the voter is assumed to have no second choice. It follows that in expressing his first and second choice, the voter must make two marks, if a paper ballot is cast. Section

203, article 33, Code of Public General Laws, Acts of 1912, ch. 2, sec. 160K. The statute of 1937 requires by section 224-F (d) that the voting machine selected must permit voting in "substantial compliance with the provisions of section 203" of article 33.

The voting machine which was selected was placed on exhibition in the office of the Supervisors of Election before the bids were opened. It was ready for operation, and a ballot was shown as it was to be voted. The arrangement of the ballot and the manner of voting are known as "plan A," and the machine is referred to here as Exhibit 1. The ballot was arranged for a primary election similar to the one last mentioned. Under plan A the voter might depress one lever and vote for X as his first choice. Thereupon the machine locked, and he could not vote his second choice nor could he vote a second choice ballot only. However, if he have a first and a second choice, he may, by pushing down but one lever, vote both his first and second choice.

By these devices the voter expresses his intention. If it be to vote his first and his second choice, and it can be done by a' single movement of the lever, why should he be required to express the same intended vote by two movements when one will do? A mere economy of effort in giving effect to an identical intention with the same result introduces no substantial difference between plan A and section 203. In the machine known as Exhibit 2, there is a different arrangement, so that to vote his first and second choice the voter moves a lever for each choice. This arrangement is known as plan B, which is conceded to be legal. Both plan A and plan B allow the voter to cast a first choice vote, without voting a second choice; and not only prevent the voter from voting for the same candidate for first and second choice, but also make it impossible for the voter to vote only a second choice vote. Thus the machine makes it impossible for the voter to commit the errors which the paper ballot corrects by the provisions that if the voter marks the same candidate for first choice and for second choice, the ballot is only

counted for first choice for the candidate, and is not counted at all for second choice; and if the ballot is only marked for second choice, it is counted for first choice. So, under section 203, the alternative second choice must be made in union with the voter's first choice if a first and second choice vote is expressed. The voter's second choice is not effective if his first choice get the nomination. His alternative second choice cannot operate, until and unless his and other first choice votes fail to nominate that candidate. It thus appears that machines arranged and equipped in accordance with plan A or plan B are in substantial compliance with section 203, and accomplish the same ultimate object. *Carr v. Hyattsville*, 115 Md. 545, 81 A. 8.

The third and most difficult and grave problem is whether the type of voting machines bargained for is lawful, since it has no provision made for the voter to cast his ballot for any other candidates than those appearing on the voting machine ballot. The determination of this question depends upon the meaning of several constitutional provisions in relation to the exercise of the elective franchise. The first is article 7 of the Declaration of Rights, which is: "That the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; for this purpose elections ought to be free and frequent, and every male citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

And the qualifications for the exercise of the elective franchise are thus prescribed by section 1 of article 1 of the Constitution: "All elections shall be by ballot; and every male citizen * * * shall be entitled to vote * * * at all elections hereafter to be held in this State." Constitution of 1867.

These provisions have been substantially in every Constitution of Maryland. Before and at the time of the adoption of the Constitution of 1867, the elective franchise was exercised by unofficial ballots on which the voters freely wrote the names of their own selection for

the offices to be filled, or marked out names of candidates, if the ballot was printed. Thus the election was free and the right of suffrage was fully enjoyed. *Harris on Election Administration* (1934) 165; *Steiner on Citizenship and Suffrage in Maryland,* 31, 78. This manner of voting continued until the introduction of the Australian Ballot Law, which put an end to the use of unofficial ballots. Acts of 1890, ch. 538; 1892, ch. 236; 1896, ch. 202, secs. 49, 50. The official ballot provided was not designed nor intended to abridge the freedom and initiative of the citizen in the exercise of the right to vote according to his desire. Its purpose was to preserve the integrity and purity of an election by the prevention of fraud, trickery, and corruption, and to secure the secrecy of the vote and the voter from intimidation, coercion, and reprisal without any abridgment of his rights in the enjoyment of the elective franchise. So, while the ballot became official and formal in arrangement, and the choice of the voter was primarily limited to those candidates for office who had complied with the conditions prescribed by the statute before their names would be placed on the official ballot for the vote of the electors, nevertheless provision was made for the voter to write, in appropriately provided blank spaces, the names of such persons as he had selected for office. (Acts of 1890, ch. 538, sec. 137, p. 619; 1924, ch. 581, sec. 55.)

It is stated by competent authority that: "All but seven states provide for, or permit, the elector to vote for persons who have not been nominated, and whose names are not printed on the ballot." *Harris on Election Administration* (1934), p. 176; *Brooks on Political Parties and Election Problems* (1936) (3rd Ed.), p. 428. In *Cole v. Tucker,* 164 Mass. 486, 488, 41 N. E. 681, it is stated: "The provisions of the statute requiring the use of an official ballot do not touch the qualifications of the voters, but they relate to the manner in which the election shall be held. In general, it may be said that the so-called 'Australian Ballot Acts,' in the various forms in which they have been enacted in many of the states of this

country, have been sustained by the courts, provided the acts permit the voter to vote for such persons as he please, by leaving blank spaces on the official ballot, in which he may write, or insert in any other proper manner, the names of such persons, and by giving him the means, and a reasonable opportunity, to write in or insert such names."

While regulations and methods are necessary to assure the secrecy and purity of elections, and it is the province of the General Assembly to legislate to provide these requisites for the proper functioning of the state and national systems of government, and to leave the citizens satisfied and contented in an unhampered expression of the popular will, nevertheless the statutes enacted are unconstitutional and void should the attempted regulations or restrictions be a material impairment of an elector's right to vote. *Cooley on Constitutional Limitations* (8th Ed.), p. 139, n. 5; pp. 1394, 1368. *Southerland v. Norris,* 74 Md. 326, 328, 22 A. 137; *Pope v. Williams,* 98 Md. 59, 56 A. 543.

The right to give expression to the elector's choice for office by means of his ballot, and not to be confined to those candidates whose names are printed on an official ballot, is an important one. In effect it has been so adjudged since the courts have sustained the constitutionality of the Australian Ballot Acts, provided the acts permit the elector to vote for such persons as he pleases by having blank spaces on the official ballot in which he may write or insert in any other proper manner the names of such persons, and by giving the voter the means and the reasonable opportunity to write in or insert such names. *Cole v. Tucker, supra.*

So in the Acts of 1890, ch. 538, sec. 137, pp. 618, 619, the official ballot then prescribed was required to have "left at the end of the list of candidates for each different office as many blank spaces as there are officers to be voted for, in which the voter may insert in writing or otherwise the name of any person not printed on the ballot for whom he may desire to vote as a candidate

for such office." A similar provision was in continuous effect by re-enactment from 1890 until it was eliminated in 1924 by chapter 581 of the Acts of 1924, now codified in article 33, section 63, of the present Code. See Acts of 1892, ch. 236, pp. 321, 322; 1896, ch. 202, secs. 49, 51; 1901, ch. 2, sec. 4, subsec. 49; Supplement to Code 1890-1900, art. 33, sec. 49; Code of 1904, art. 33, sec. 53, p. 1033; Code of 1911, art. 33, sec. 54, pp. 875, 876; vol. 4 (1916-1918), sec. 55, p. 258.

The General Assembly in 1924 failed, however, to amend section 80 of article 33 (chapter 225, section 71, of Acts of 1914) which provided for the count of ballots on which the name or names of any candidates had been written by the voter on the ballot, as provided in section 53, article 33, of the Code of 1904, which authorized the voter to write on the ballot the name of any person for whom he desired to vote. See Acts of 1927, ch. 370. It was not until chapter 120 of the Acts of 1931 that the General Assembly eliminated this provision from section 80 of article 33 of the Code. (Code [1935 Supp.], art. 33, sec. 80.) Meanwhile, the Attorney General of Maryland had in 1926 rendered an opinion that chapter 581 of the Acts of 1924 had been passed to shorten the ballot by the elimination of blank spaces; and that, as section 62 of article 33 of the Code of 1924 did not authorize the writing of additional names on the ballot by a voter, the provision in section 80 authorizing the count of such votes was nugatory. In 1936, the Attorney General gave a second opinion in accordance with the former one, and held that for a voter to write on the ballot the name of his candidate and vote would prevent the ballot from being counted. (Opinions of Attorney General, vol. 11, p. 96; vol. 21, p. 354.) When the Voting Machine Board was preparing the specifications for the letting of the contract for the machines, it requested the Attorney General for his official opinion on this subject. Under date of July 24th, 1937, the reply was that the voting was denied in Maryland.

Whether the General Assembly had attempted to pro-

hibit the form of voting with which these appeals are concerned in 1924, as was the opinion of the Attorney General in 1926, or in 1931, as the second opinion indicates, the legislation and the correspondence would establish that the question was not accepted as settled. The voter enjoyed the right completely before the official ballot was required in 1890, and from then until 1924, at least, the right was assured him by the General Assembly. If since that time no voter has raised the point of its legality and all the public officials have' acquiesced in the failure to provide blank spaces and the means and reasonable opportunity for the voter to write in or insert in any other proper manner the names of his choice, nevertheless, if the right be a constitutional one, it is not thereby lost. *Arnsperger v. Crawford,* 101 Md. 247, 258, 259, 61 A. 413; *Somerset County v. Pocomoke Bridge Co.,* 109 Md. 1, 7, 8, 71 A. 462.

While there is no precedent of this court in point, there can be no doubt that the question is a constitutional one of substance. The decisions of other jurisdictions leave no doubt of its fundamental nature and inherent gravity. *Supra.* "The elective franchise," it is said in *Kemp v. Owens,* 76 Md. 235, 241, 24 A. 606, 608, "is the highest right of the citizen, and the spirit of our institutions requires that every opportunity should be afforded for its fair and free exercise." An election is not free, nor does the elector enjoy a full and fair opportunity to vote, if the right of suffrage is so restricted by statute that he may not cast his ballot for such persons as are his choice for the elective office. If this right to vote be considered historically, and in relation with the legal and constitutional provisions which existed when the Constitution of 1867 was promulgated and adopted, there can be no denial that the statutes of 1924 and later are an abridgment and denial of the elective franchise which the Constitution intended to preserve. The proof is not only in the history of the elective franchise, but in the statutes, and especially in the acts passed and in force during the period from 1890 to 1924. An impairment of a constitutional right is

of major consequence. It was said in *Arnsperger v. Crawford*, 101 Md. 247, 258, 61 A. 413, 417: "And we may add that it is the infringement of the constitutional rights of the few in minor matters which leads to the disregard of the rights of the body of the people in matters of graver import, and that no constitutional right can be so unimportant as to justify a court in failing to enforce it when its aid is invoked for that purpose." Here, however, is no minor matter. The right to vote is the right to choose the person for whom the ballot is cast. The election is not free if the elector may not make this choice. Nor does the exercise of this right depend upon either the wisdom, the expediency, or the futility of the choice. If the constitutional right exist, the choice is absolute. If the power to choose is not according to the will of the elector, but limited to a choice of the candidates whose names are printed or otherwise appear on an official ballot, the voter's choice is no longer free. His choice is thus circumscribed by an official ballot, and he is not free to vote his personal choice.

It is no answer to say that the names on the official ballot are the candidates of political parties or of principles, who have been nominated by conventions or by primary meetings or by a certificate of nomination, which last contains prescribed information with reference to one candidate, and the statement of the signers that they intend to vote for the person so nominated. The number of signatures varies from the lowest of 500, through the rising gradations of 750, 1,500, and 2,000, in accordance with the relative territorial extent of the political division in which the candidate and signers reside, and whose voters elect the incumbent of the office sought by the candidate. Code, art. 33, secs. 51-57, and section 58, as amended by Acts 1927, ch. 244. These provisions are intended to exclude the casting of a vote for any candidate except one thus nominated by conventions, primary meetings, or certificate of nomination. In only the case of the voter who had signed a certificate of nomination for a particular candidate, and

had thereby agreed to vote for him, would a ballot cast by that voter be the voter's personal choice. If the elector were not such a signer, his choice would be limited to the names on the ballot, which is not the freedom of choice which subsisted before and for years after the official ballot was introduced. Nor is the provision for a nomination by the requisite certificate a sufficient gratification of the constitutional right to vote. The fundamental principle involved is the personal right of an elector to exercise his individual choice in the casting of his ballot for whom he prefers. For this precious right to reject, which is implicit in his right to choose, there is no equivalent nor constitutional substitute. The elector has the right to refuse to vote for a single official nominee, whatever may be his reason or motive, and the statutory deprivation of his right to vote for his own choice is not compensated by the privilege to make the costly, precarious, and laborious efforts to unite the large group of voters, in support of his own or another party's candidacy, which would be necessary for a nomination by certificate. The right of the elector to vote his own ballot is not in the same category as the organization of a political group and the nomination of its candidate. *Cohn v. Isensee,* 45 Cal. App. 531, 188 P. 279.

In *Iverson v. Jones,* 171 Md. 649, 187 A. 863, the questions before the court involved solely the matter of the right of candidates of a party to have their names printed on the official ballot. The appeal was dismissed on the ground that if the writ of mandamus were to issue, it would be nugatory, as the time had expired within which the Secretary of State was required to make the necessary certification of the party nominees. The court, however, did call attention to the delay and to the fact that the proper methods had not been followed to entitle the candidates of a new party to have their names printed on the ballot. The cited opinion made no reference to the question here presented, as it was not raised nor necessary.

Nor may the elector's vote be restricted to one of the

candidates on the official ballot upon the theory that this substantially secures to the elector his constitutional rights. It must be considered in this connection that every voter has but a single vote to cast. This vote, whether cast with the majority or the minority, is as important in terms of personal value and constitutional significance as every other vote. The futility of the elector's vote is not the measure of his constitutional right. The civic and political importance of an unabridged and unhampered choice lie in the freedom of the elector to exercise fully this right on any occasion, without the power of the General Assembly to nullify or restrict.

It may well be that the official ballots cast rarely disclose that any voter has made an independent choice of a candidate by writing in the name in the space provided, but this circumstance is not a reason to conclude the right has no practical political utility, since it merely shows that, in full enjoyment of the right to choose his candidate not only from those whose names appear on the official ballot but also from those persons whom he would approve as candidates, the elector made his choice, and so marked his ballot accordingly. Furthermore, the political importance of the preservation of the right considered is enhanced by its potential value in a civic crisis where, because of want of time or of adverse political conditions, an aroused electorate would have as its sole recourse for the expression of the popular will the right to vote in an election for its own freely chosen candidates. *People ex rel. Bradley v. Shaw,* 133 N. Y. 493, 31 N. E. 512; *Barr v. Cardell,* 173 Iowa 18, 155 N. W. 312, may be noted as two instances in which the written votes elected their choice.

Turning now to authority, it is found that the problem has been presented in various forms. A number of courts have declared that if the statutes had not permitted the elector to vote by writing in the official ballot his choice, and so had confined the voter to a selection from the names of candidates on the ballots, the statutes would have been unconstitutional. As was said in *People v. President etc.*

*of Wappingers Falls* (1895), 144 N. Y. 616, 620, 39 N. E. 641, 642: "Constitution confers upon every citizen meeting the requirements specified therein the right to vote at elections for all offices that are elective by the people, and there is no power in the legislature to take away the right so conferred." *Cohn v. Isensee* (1920), 45 Cal. App. 531, 188 P. 279; *Patterson v. Hanley* (1902), 136 Cal. 265, 68 P. 821, 975; *Stewart v. Cartwright,* 156 Ga. 192, 118 S. E. 859, 861, 862; *Barr v. Cardell* (1915), 173 Iowa 18, 155 N. W. 312; *Sanner v. Patton* (1895), 155 Ill. 553, 40 N. E. 290; *People v. McCormick* (1913), 261 Ill. 413, 103 N. E. 1053, 1057; *Fletcher v. Wall* (1898), 172 Ill. 426, 50 N. E. 230; *Cole v. Tucker* (1895), 164 Mass. 486, 41 N. E. 681; *People ex rel. Oatman v. Fox* (1897), 114 Mich. 652, 72 N. W. 611; *People ex rel. Bradley v. Shaw* (1892), 133 N. Y. 493, 31 N. E. 512; *Wescott v. Scull,* 87 N. J. L. 410, 96 A. 407; *De Walt v. Bartley* (1892), 146 Pa. 529, 24 A. 185; *Oughton v. Black* (1905), 212 Pa. 1, 61 A. 346-348; *State v. Anderson* (1898), 100 Wis. 523, 76 N. W. 482, 484, 485; *Bowers v. Smith* (1892), 111 Mo. 45, 46, 20 S. W. 101, 110, 111; *Park v. Rives,* 40 Utah 47, 119 P. 1034.

These decisions are carried to their logical conclusion by two cases which hold that an attempted elimination of the right of the elector to cast his ballot for such persons as he pleases is void. *State v. Dillon* (1893), 32 Fla. 545, 14 So. 383 (cited with approval on another point in *Hanna v. Young,* 84 Md. 179, 183, 35 A. 674) ; *Littlejohn v. People* (1912), 52 Colo. 217, 222, 121 P. 159.

The decisions which have been cited are generally accepted as establishing the unconstitutionality of statutes which deny to the elector the right to vote for such persons as he pleases by depriving him of the means and the reasonable opportunity to write or to insert in any other proper manner the names of such persons on the official ballot. *McCrary on Elections* (4th Ed.), sec. 700; *Cooley on Constitutional Limitations* (8th Ed.), vol. 1, pp. 139, 140, n. 5; vol. 2, p. 1370, p. 1376; 20 *C. J. "Elections",* sec. 16, pp. 62, 63; sec. 91, p. 105; sec. 162, pp. 140, 141;

10 *Am. & Eng. Ency. of Law* (2nd Ed.), 586, 587; 9 *R. C. L. "Elections"*, sec. 70, p. 1054.

In conflict with the decisions and authorities given, the following cases are cited: *Chamberlain v. Wood* (1901) 15 S. D. 216, 218, 88 N. W. 109, and *State, ex rel. Mize v. McElroy* (1892) 44 La. Ann. 796, 11 So. 133, and *McKenzie v. Boykin* (1916) 111 Miss. 256, 71 So. 382. Compare *Jackson v. State, ex rel. Howie,* 102 Miss. 663, 59 So. 873; *State v. Ratliff,* 108 Miss 242, 66 So. 538. It should be said that the case decided by the appellate court in South Dakota was by a divided court. The tribunal was composed of three members, and the prevailing opinion was written by Corson, J., and the dissent by Fuller, J., the presiding judge. The third member, Haney, C. J., does not appear to have participated, so the affirmance is by a divided court. See 91 *Am. St. Rep.* 688, note. The case of *McKenzie v. Boykin, supra,* recognizes the doctrine that the voter's choice must not be unreasonably restricted, but finds that the privilege of a combination of fifteen voters to require the name of a candidate, who is not a party nominee, to be put on the ticket, is not an unreasonable restriction.

In *State ex rel. Mize v. McElroy, supra,* it was held that writing the name of a person across the face of the ballot on which his name did not appear as a candidate invalidated the ballot because the voter was not permitted by statute to cast his vote in this manner.

The decisions of the three states named are opposed by a preponderance of authority; and the grounds on which they rest are not persuasive in view of the reasons assigned in support of the majority view.

The conclusion of the court that it is the constitutional right of an elector to cast his ballot for whom he pleases, and that it is necessary for him to be given the means and the reasonable opportunity to write or insert in the ballot the names of his choice, is subject to this limitation, that the right is not applicable to primary elections, nor to municipal elections other than those of the City of Baltimore. This exception must be made, since the pro-

visions of article 1, section 5 of the Constitution have
been held to apply solely to the right to vote at federal
and state elections, and municipal elections in the City
of Baltimore. *Smith v. Stephan,* 66 Md. 381, 388, 389,
7 A. 561, 10 A. 671; *Hanna v. Young,* 84 Md. 179, 35 A.
674; *Johnson v. Luers,* 129 Md. 521, 531, 532, 99 A. 710;
*State v. Johnson* (1902) 87 Minn. 221, 91 N. W. 604, 840;
*Willoughby on Constitution of the United States* (2nd
Ed.) sec. 356, p. 646.

The Automatic Company has offered to deliver, in
performance of the contract, either of the two types of
machines which are constructed and arranged according
to plan A and plan B, but, as these machines do not
provide for the elector casting a vote for any other than
a candidate whose name appears on the official ballot, the
Voting Machine Board has no power to purchase and
accept either type of machine, although, except in respect
of the defect named, both machines are in substantial
compliance with the provisions of chapter 94 of the Acts
of 1937, and the specifications drawn by the board.

The chancellor, therefore, decreed the use of the
machines would be unlawful and the purchase of such
machines would be *ultra vires.* In the conclusion this
court concurs. The testimony on the record is to the
effect that the voting machines which the bidder had
agreed to furnish could, at an additional expense of $82
a machine, be furnished with the requisite added equip-
ment to enable an elector to cast his ballot for any can-
didate whom he might choose in preference to those
whose names appeared as candidates on the official bal-
lot. This court does not construe the decrees of the chan-
cellor to prevent the Voting Machine Board from making
another contract with the Automatic Company whereby
the machines of the type known as plan A and plan B,
when provided with the necessary equipment for the pur-
pose mentioned, may be bought at the suggested advance
of $82 a machine over the price of the ultra vires con-
tract. Whether such a course at that price or less is
for the public advantage is a question for the board,

which, however, is not confined in the purchase to one contractor nor to a particular make or type of machine and form of contract. The board, in the exercise of the discretion conferred, may, according to its judgment and in the public interest, discharge, within the authority granted, the duty committed either with or without competitive bidding. *Supra.*

The point is made that, because of the provisions of paragraph 43 of the specifications, that "The contractor shall furnish and deliver all of said voting machines to be purchased under this contract to the Voting Machine Board in strict accordance with and to meet the requirement of all of the terms, conditions and provisions of Chapter 94 of the Laws of Maryland, Regular Session of 1937, any and all other laws and contract documents," the contract is valid. The position taken is based upon the theory that, since this quoted paragraph imports into the contract the requirement of subdivision (d) of section 224-F, chapter 94 of the Acts of 1937, that every voting machine acquired or used under the provisions of this subtitle shall, "(d) permit each voter to vote, at any election, for any person and for any office for whom and for which he is lawfully entitled to vote, and to vote for as many persons for an office as he is entitled to vote for, including a substantial compliance with the provisions of Section 203 of this Article," the legal effect of the language of the contract is to require the contractor to furnish voting machines which would be supplied with the necessary equipment for the elector to write in his personal choice when other than a candidate whose name appears on the official ballot.

The construction invoked would require the contractor to deliver a machine which the proponent of this theory must concede was not conceived by any party to the contract to have been within its contemplation, It is now urged as an obligation which is claimed to arise from an alleged mutual mistake of law with regard to the legal effect of the language used in the contract. The court is unable to agree with this conclusion, but believes the question to be one of interpretation of the contract.

Although, since the passage of the Acts of 1931, ch. 120 (section 80 of article 33 of Code [1935 Supp.], the statutory law has declared that a ballot must be rejected if a voter should write in the name of his personal choice, nevertheless the quoted language of subdivision (d) section 224-F, Acts 1937, ch. 94 is broad enough to provide for the elector to vote "for any person and for any office for whom and for which he is lawfully entitled to vote," which would permit a vote to which every elector is entitled under the Constitution, and for which the statute assured its count until the Act of 1931, ch. 120. So, under the Acts of 1937, ch. 94, the voting machine authorized should permit such a vote to be cast as, in fact, was permitted to be done by the fifty voting machines which had been previously purchased by Baltimore City and which were, by section 224A of chapter 94 of the Acts of 1937, directed to be used in all future elections in Baltimore City.

While the obligation was cast by the statute upon the voting machine board to buy machines in accordance with the terms of the statute, the specifications submitted to the competitive bidders were general, as are the quoted provisions of paragraph 43, and particular, as are, under the caption "Size and Type of Voting Machines," the terms of paragraphs 44 and those found, under the subtitle "samples," in paragraph 47. By the particulars of the size and type desired as specified in paragraph 44, the machine is required to provide for voting for the candidates of nine different parties, and on at least twenty questions or special measures.

The machine to be furnished in conformity with these particular specifications of the official body is therefore not required to afford the voter an opportunity to write on the ballot his personal choice other than from among the candidates on the official ballot. Again, the machine proposed to be supplied by the bidder was to be completely built and ready for operation and, with its equipment and accessories, was to be set up by the bidder in the office of supervisors of election on the day the bidder submits his

bid. This sample is demanded by paragraph 47, and it must be what the bidder proposes to furnish and deliver, if awarded the contract. Paragraph 47 concludes with the provision that the sample voting machine, equipment, and accessories thus set up shall be taken by all parties concerned to be representative in all respects of the voting machines, equipment, and accessories to be furnished and delivered by the successful bidder, subject to all the provisions of the contract documents.

The formal bid or proposal was an offer to deliver a specific machine, equipment, and accessories, at a certain price, in accordance with these particular specifications and the sample which had been duly furnished. It was an offer to supply a machine according to sample. The voting machine board opened the bids on August 11th, 1937, and, having been advised by the Attorney General of Maryland of his opinion that since 1931 a voter was prohibited from casting a vote for a person other than one whose name was on the official ballot as a candidate, the voting machine board passed a resolution accepting the bid of the Automatic Machine Corporation, and on the 8th of September a formal agreement was made for the purchase of the machines described in the bid or proposal, without the addition of any other terms than those of the proposal.

The contract is void because the voting machine board had no power to enter into a contract for a machine which prevented an elector from exercising his elective franchise under the Constitution. The void contract fails, while wholly executory, for lack of power in the voting machine board to make the contract. The fact that one party to a purporting executory contract has no power to make the contract attempted cannot result in changing and enlarging the undertaking of a seller by sample, so that, by implication, he may become bound to supply an article which is within the power of the purchaser to buy, but different from the sample of the article which the seller agreed to sell. The promisor cannot be compelled to deliver things which he has not agreed, nor can

he enforce against the buyer, subject to statutory limitations, the acceptance of the thing bought and the payment of the agreed price, if the buyer has no power to buy the thing attempted to be sold. There is a lack of consideration for such a contract, and it must fall.

For the reasons assigned in this opinion, the decrees of the chancellor passed in both causes on October 14th, 1937, will be affirmed.

It may be said by way of summary that the effect of the decision here is to affirm the power and authority of the voting machine board to select and buy the make and type of voting machine required. *Baltimore v. Weatherby,* 52 Md. 442; *Fuller Co. v. Elderkin,* 160 Md. 660, 668, 669, 154 A. 548. In the performance of this exigent duty, the board is not subject to the control, advice, approval, nor ratification of the State Central Purchasing Bureau; and is not affected by the provisions of the Charter of Baltimore City in respect to competitive bidding. The voting machine board may conduct such negotiations and make the contract to buy, with or without competitive bidding, and upon such terms as are authorized and believed by it to be in the public interest.

*Decrees in both appeals affirmed, with costs to be paid by the Mayor and City Council of Baltimore.*